# ADDENDUM

# ADDENDUM – TABLE OF CONTENTS

| **Document** | **Page(s)** |
|---|---|
| Order Disqualifying Stefanie Lambert, *U.S. Dominion Inc. et al. v. Patrick Byrne*, Case 1:21-cv-02131-CJN-MAU (ECF 125) | A.1 |
| Memorandum Opinion, *U.S. Dominion Inc. et al. v. Patrick Byrne*, Case 1:21-cv-02131-CJN-MAU (ECF 126) | A.4 |
| Order Affirming Disqualification of Stefanie Lambert, *U.S. Dominion Inc. et al. v. Patrick Byrne*, Case 1:21-cv-02131-CJN-MAU (ECF 144) | A.66 |
| Order Denying Motion for Reconsideration, *U.S. Dominion Inc. et al. v. Patrick Byrne*, Case 1:21-cv-02131-CJN-MAU (ECF 154) | A.71 |
| Plaintiffs-Appellees Certificate of Parties and Amici | A.73 |
| Plaintiffs-Appellees Corporate Disclosure Statement | A.74 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**PATRICK BYRNE,**<br><br>**Defendant.** | Civil Action No.<br>1:21-cv-02131 (CJN) (MAU) |

### ORDER[1]

Upon consideration of Plaintiffs' ("Dominion") Emergency Motions for Protective Relief and to Disqualify Counsel (ECF Nos. 75 & 82) and to Enforce the Protective and Status Quo Orders (ECF Nos. 108 & 112), Defendant's ("Byrne") Oppositions thereto (ECF Nos. 76, 97, 117), Dominion's Supplements (ECF Nos. 102, 105, 113), Byrne's Supplements (ECF Nos. 106 & 111), any evidence submitted and arguments made at the Court's hearings on this matter, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby,

**ORDERED** that Dominion's Motion for Protective Relief and to Disqualify Counsel, ECF No. 75, is **GRANTED**, and it is,

**FURTHER ORDERED** that Dominion's Motion to Enforce the Protective and Status Quo Orders, ECF No. 108, is **GRANTED**, and it is,

---

[1] The District Judge referred all discovery disputes to this Court on January 31, 2024. 01/31/2024 Minute Order. Because Dominion's motions request sanctions against Lambert due to her conduct related to discovery, the District Judge specifically referred ECF No. 75 to this Court on April 15, 2024. 04/15/2024 Minute Order.

1

**FURTHER ORDERED** that Dominion's Motions for Leave to File Supplement, ECF Nos. 118 and 122, are **DENIED WITHOUT PREJUDICE**, and it is,

**FURTHER ORDERED** that the requirements set forth in the Status Quo Order, ECF No. 77, at ¶¶ 1, 2, 4, 5, 6, 7 shall remain in effect through the resolution of this case, and it is,

**FURTHER ORDERED** that Attorney Stefanie Lynn Junttila [Lambert] ("Lambert") and Byrne shall each provide a full accounting, in the form of sworn affidavits, by no later than August 20, 2024 at 5:00 p.m. EST, detailing:

- The date of any fee agreement between Lambert and Byrne and the scope of representation or, if no such agreement exists, the date on which Lambert and Byrne understand that a lawyer/client relationship had formed;

- An accounting from Byrne's outside vendor showing what documents Byrne and or Lambert accessed, on what date, and whether they were downloaded;

- A complete and accurate list of all Dominion-produced documents and information Lambert received and the method and date of access;

- An account of every step Lambert has already undertaken or that is underway to determine the scope of the breach and to ensure it is not continuing; and

- An accounting attesting (i) to whom Lambert and/or Byrne leaked, released, or otherwise disclosed documents or information protected by the Protective Order (including in court filings in any cases outside of this case); (ii) how and when they provided it; (iii) every occasion on which they did so; (iv) for each such instance, what specifically was leaked, released, or otherwise disclosed; and, if any of those individuals signed an Undertaking pursuant to the Protective Order.  If so, Lambert and Byrne shall attach the Undertakings to their affidavits.

2

To the extent Lambert or Byrne claim any of the material above is protected by the attorney-client privilege or work product doctrine, Lambert shall provide a detailed privilege log setting forth all sufficient detail of the communication to allow Dominion to assess the claim of privilege.  It is,

**FURTHER ORDERED** that to the extent Dominion wishes to propose any destruction protocol with respect to Lambert, it is ordered to do so by August 20, 2024, and it is,

**FURTHER ORDERED** that Lambert is hereby **DISQUALIFIED** as Counsel to Byrne in this matter effective immediately, and it is,

**FURTHER ORDERED** that Byrne shall notify the Court by September 13, 2024 whether he has retained new counsel or whether he intends to proceed *pro se*.  If he obtains new counsel, that new counsel must enter their formal notice of appearance by September 13, 2024.

**SO ORDERED.**

Date: August 13, 2024

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**PATRICK BYRNE,**<br><br>**Defendant.** | Civil Action No.<br>1:21-cv-02131 (CJN) (MAU) |

## <u>MEMORANDUM OPINION</u>

This case arises out of the 2020 U.S. election.  Plaintiffs US Dominion Inc., Dominion Voting Systems Inc., and Dominion Voting Systems Corporation ("Dominion") sue Defendant Patrick Byrne ("Byrne") for defamation related to allegedly false statements Byrne made about Dominion's role in that election.  Compl. (ECF No. 1) ¶¶ 152–163.[1]  Among the statements at issue are those in which Byrne claimed that Dominion ran the 2020 election; Dominion technology was developed by Hugo Chavez in Venezuela; and that Dominion hired a truck to shred "3,000 pounds of ballots."  ECF No. 33 at 34.  Dominion asserts that these statements are false and not only harmed its reputation and business, but also resulted in serious threats to its employees, their families, and election workers.  Compl. ¶¶ 126–51.

---

[1]      The other cases that are consolidated or coordinated for discovery are: *Dominion, et al. v. Herring Networks, Inc., et al.* (21-cv-2130); *Dominion, et al. v. MyPillow, Inc., et al.* (21-cv-445); *Dominion, et al v. Powell, et al.* (21-cv-040); and *Dominion, et al. v. Giuliani* (21-cv-0213).  The *Giuliani* case is stayed pending bankruptcy proceedings.  For all citations not otherwise specified, the Court cites to docket entries in Case No. 21-cv-2131 and page numbers in ECF headers.

This litigation has been ongoing for nearly three years and is currently in discovery.  This dispute centers on that discovery process, specifically repeated instances of non-compliance with the Court's Orders governing the disclosure and use of discovery material.  From June 2023 until March 2024, all counsel and Parties in the case (including Byrne) seemingly abided by the Amended Protective Order ("Protective Order") governing discovery.  ECF No. 46.  Before even her first appearance in this case on March 12, 2024, however, Byrne's new counsel, Stefanie Junttila [Lambert] ("Lambert"), began openly violating orders, including by disseminating protected discovery material.  ECF Nos. 71; 75; 82; 102; 108; 113.  Due to Lambert's actions, thousands of documents ("Dominion's Litigation Documents") which all Parties, including Byrne himself, had agreed to keep confidential, have now been shared widely in the public domain. Lambert and Byrne continue to evade the Protective Order and this Court's March 19, 2024 Order ("Status Quo Order") that prohibits further dissemination until resolution of this Motion.  ECF Nos. 75; 77; 82; 102; 105; 108; 113.

Before the Court is Dominion's Emergency Motion for Protective Relief and to Disqualify Counsel.  ECF No. 75.  Although Byrne has violated the Protective Order as set forth below, the full scope of Byrne's actions is not yet known.  And what, if any, sanction Dominion might seek against him is not before this Court at this time.[2]  The only questions currently before the Court are whether Lambert violated court orders and rules, and if so, whether she should be disqualified from this case.

The remedy Dominion seeks, Lambert's disqualification from serving as Byrne's counsel in this case, is extraordinary and rarely granted outside of cases involving conflicts of interest.

---

[2]      Dominion has reserved its right to seek additional sanctions against Byrne and requested additional discovery into his conduct, including what led to the ultimate disclosures.

Nevertheless, the record clearly shows that Lambert deliberately violated multiple court rules and orders and continues to do so despite having had ample warning of the consequences and assuring the Court she would comply. Lambert's repeated misconduct raises the serious concern that she became involved in this litigation for the sheer purpose of gaining access to and publicly sharing Dominion's protected discovery. Because Lambert's "truly egregious misconduct" has already and will undoubtedly continue to "infect future proceedings," this is the rare case in which disqualification is warranted. *Koller By and Through Koller v. Richardson-Merrell, Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). Dominion's motion is **GRANTED**.

## BACKGROUND

The relevant facts are largely undisputed.

### Protective Order

The Court initially entered the Protective Order in three related cases (which are now coordinated or consolidated for discovery) on December 6, 2022. ECF No. 152 in Case No. 21-cv-445 (applying to Case Nos. 21-cv-445; 21-cv-213; and 21-cv-40). On June 8, 2023, Dominion and Byrne jointly moved the Court to enter the December 2022 Protective Order in this case. ECF No. 45. Per the stipulation, Byrne expressly agreed:

> The Order governs the handling of Discovery Materials within the Consolidated Cases and allows the parties to the Order to share Discovery Materials between those three actions—but prohibits persons or entities receiving Discovery Material produced in the Consolidated Cases *from using those Discovery Materials outside of those three cases, except as specifically provided by the Order*.

3

A.6

*Id.* at 1–2 (emphasis added).  Dominion and Byrne requested that the Protective Order be entered in this case to "facilitate . . . voluntary discovery coordination."  *Id.* at 2.  The Court granted the Parties' joint motion and entered the Protective Order in this case on June 16, 2023.  ECF No. 46.[3]

The Protective Order states:

1. Any Discovery Material produced in the Litigation will be used, except by the Producing Party, *solely for purposes of this Litigation and no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery Material public except as permitted by this Order and in this Litigation*.

ECF No. 75-7 ¶ 1 (emphasis added).

The Protective Order defines "Discovery Material" as:

[D]ocuments, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom ("Discovery Material"), by or among any Party or non-Party providing Discovery Material (each a "Producing Party") in the Litigation to the party receiving the Discovery Material ("Receiving Party").

*Id.* at 4.

Within the broad prohibition against using any Discovery Material outside of the related litigation, the Protective Order contains additional protections and procedures for the use of Confidential and Attorneys' Eyes Only ("AEO") materials.  ECF No. 75-5.  The Protective Order also sets forth procedures for how a Party can seek to challenge designations or disclose discovery

---

[3]     Dominion attached ECF No. 46 to the Motion at issue because it was the operative Protective Order at the time.  ECF No. 75-7.  On March 21, 2024, after Dominion filed its Motion, the Court entered an amended Protective Order to which all Parties agreed.  ECF No. 79.  The Protective Order at ECF No. 79 is now the operative Protective Order but does not alter the relevant provisions of the initial Protective Order that has governed Party conduct in this case since June 16, 2023.  To avoid confusion, the Court will use the ECF citation and page numbers for ECF No. 75-7 when citing to the Protective Order going forward.

notwithstanding the order. *Id.* ¶¶ 15, 16. Paragraph 16 sets forth procedures for a Party to object to the initial designation of discovery materials as protected. *Id.* ¶ 16. Specifically, it permits a Party to object to the designation of Discovery Material as Confidential or AEO by sending written notice to and meeting and conferring with the designating Party. *Id.* If this process does not resolve the issue, the objecting Party may file a motion with the Court to strike the designation within twenty-one days of the meet and confer. *Id.* Importantly, while the dispute is pending, the discovery materials "will be treated as Confidential or [AEO] pursuant to [the] order." *Id.*

Paragraph 15 allows a Party to object to the continued restriction on public access to confidential/AEO discovery materials:

> Any Party who objects to the continued restriction on public access to any Confidential or Attorneys' Eyes Only Filing, or any portion thereof, will give written notice of the objection to the Party that designated the Discovery Material as Confidential or Attorneys' Eyes Only ("the Designating Party"). To the extent that the Designating Party seeks to continue the restriction on public access to the Confidential or Attorneys' Eyes Only Filing, or any portion thereof, the Designating Party will file an application with the Court within seven (7) days for a judicial determination as to whether good cause exists for continued restricted access to the Confidential Filing, or any portion thereof.

*Id.* ¶ 15.

Paragraphs 8 and 9 permit Confidential and AEO material to be disclosed to certain people, some of whom must sign an Undertaking to gain access. *Id.* ¶¶ 8, 9. The Party "showing, providing, or disclosing Confidential or [AEO] Discovery Material to any person required to execute an undertaking . . . will be responsible for obtaining such signed undertaking." *Id.* ¶ 10.

Additionally, Paragraph 26 requires that if a person in possession of Confidential or AEO discovery materials that they did not produce receives a subpoena for those materials, they must: 1) give notice of the request to the designating party within three business days (or 24 hours if the subpoena deadline is sooner); and 2) "object to the production of the Confidential or [AEO]

Discovery Material on the grounds of the existence of this Order." *Id.* ¶ 26.  If the designating Party opposes enforcement of the demand, the burden of opposing the demand falls to them.  *Id.*  This provision does not require the person or Party who is subpoenaed to appeal an order enforcing the demand or to otherwise seek relief from compliance.  *Id.*

If a Party discloses discovery in violation of the Protective Order, the breaching Party must "immediately inform the Designating and Producing Party" and provide an accounting of the disclosure. *Id.* ¶ 27.  Additionally, the order allows a non-breaching Party to seek sanctions against a breaching Party.  *Id.* ¶ 29 ("If a Party violates this Order by releasing, leaking, or otherwise disclosing Confidential or [AEO] Discovery Material to persons or entities not entitled to such Discovery Material under this Order, the Court will have authority to impose sanctions under Rule 37(b)(2)(A)(i)–(vi).").[4]

According to Dominion, the Parties negotiated the Protective Order "[g]iven the national security concerns regarding voting machine information and the personal security concerns for Dominion employees—many of whom have been the subject of threats in the past."  ECF No. 75 at 7.  This concern is one of the reasons why the Protective Order applies to all discovery produced in this litigation regardless of whether it is stamped "confidential" or "[AEO]."  ECF No. 75-7 ¶ 1; *id.* at 3–4 (other justifications for the Parties' Protective Order included their "belie[f] that certain information they have produced or will produce may contain information that is proprietary, commercially sensitive, or non-public").  Significantly, after stipulating to it, Byrne

---

[4]     As the plain language of Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi) permits sanctions against *parties* for discovery-related misconduct or disputes, Dominion relies in this Motion on the Court's inherent authority to regulate counsel before it.

never objected to the Protective Order.  He never asked the Court to amend or lift the Protective

Order until after he and Lambert began disclosing Dominion's Litigation Documents.[5]

In addition to the Protective Order governing all party discovery, Dominion sought and

obtained another protective order in the *MyPillow* litigation specifically related to third-party

discovery.  *See* ECF Nos. 145; 147; 149; 153; 154; 156; 157; 159 in Case No. 21-cv-445.  This

was "in response to certain third party subpoenas issued by Defendants Michael J. Lindell and

MyPillow, Inc."  ECF No. 145 at 1 in Case No. 21-cv-445.  After several rounds of briefing, the

Court entered the separate protective order governing third-party subpoenas in the *MyPillow*

litigation ("Third-Party Protective Order").  ECF No. 159 in Case No. 21-cv-445.

### Lambert Enters the Case

Lambert first formally entered her appearance as Byrne's counsel on March 12, 2024.  ECF

No. 71.  Byrne's prior counsel, attorneys at McGlinchey Stafford PLLC ("McGlinchey"),

withdrew the same day.  ECF No. 72.  Although Lambert did not appear in the case until March

2024, it is undisputed that she had been working with Byrne and his team for some time prior to

that date, unbeknownst to Dominion.  ECF No. 75 at 3.  McGlinchey and Lambert have both

acknowledged that Lambert "had access to Confidential Discovery Material as an attorney for

Patrick Byrne who was assisting in this litigation" prior to her formal entry of appearance in March

2024.  ECF No. 75-8 at 2.  Neither Lambert nor McGlinchey has provided an exact date for when

Lambert began serving as Byrne's attorney in this matter.  That said, the record is clear that

McGlinchey gave Lambert access to Dominion's Litigation Documents after she signed the

Undertaking pursuant to the Protective Order on December 12, 2023.  ECF Nos. 75-9; 103 at

27:10–19.  In signing the Undertaking, Lambert guaranteed that she had "read the Protective Order

---

[5]      Byrne filed a Motion to Lift Protective Order on April 18, 2024.  ECF No. 90.

of June 16, 2023," and would "undertake to access and use Discovery Material, Confidential Material, and Attorneys Eyes Only Material *only as the Order permits*."  ECF No. 75-9 (emphasis added).  Lambert does not dispute that she executed the Undertaking months before she disclosed the documents in March 2024.  ECF No. 103 at 58:25−59:6.

Dominion did not have notice that Lambert had access to its discovery and had signed the Undertaking until McGlinchey notified Dominion of the alleged breach on March 11, 2024.  ECF Nos. 75-8 at 2; 78 at 20:13−17 ("MS. LAMBERT JUNTTILA: And for the record, your Honor, I did not provide that [the Undertaking] to counsel.  That must have been provided by Mr. Byrne's previous counsel.").  In fact, it appears that Dominion did not even know Lambert was involved in this case until after she had released countless Dominion discovery documents to a third party and inflicted damage Dominion could not undo.  ECF Nos. 75 at 3; 75-8 at 2.

**Lambert Publicly Disseminates Confidential Discovery Material**

On March 11, 2024, McGlinchey notified Dominion that Lambert had publicly disclosed its discovery.  ECF No. 75-8 at 2.  McGlinchey told Dominion "[w]e had no advance knowledge of this use.  We only became aware of the public disclosure by virtue of the below tweet."  *Id.*

**EIF  Election Integrity Force**
@Real_EIF

🔥 Just in: Stefanie Lambert turns up the heat in MI's legal scene with a fiery Emergency Motion for a Stay. Read the explosive internal Dominion communications here: tinyurl.com/8yxbm5ab #ElectionIntegrity #BREAKING

10:37 AM · Mar 11, 2024 · 5,488 Views

*Id.*  McGlinchey notified Dominion that Lambert had disclosed Dominion's Litigation Documents in two ways.  First, Lambert included the documents in a public filing as part of a Michigan criminal case in which she had been indicted on four felony counts related to the 2020 U.S.

election.  *Id.* (citing *People of the State of Michigan v. Stefanie Lynn Lambert Junttila*, Michigan

Case No. 2023-285759-FH).[6]  Lambert filed a *pro se* motion in that case on March 8, 2024 and

attached Dominion's Litigation Documents as an exhibit.  *Id.* at 5–63.  Second, Lambert shared

the documents with Barry County, Michigan Sheriff Dar Leaf ("Leaf"), an individual who has no

role in this litigation, who went on to disseminate and discuss the documents in public.  *Id.* at 2.

That same day, March 11, 2024, Dominion counsel responded to McGlinchey to request

more information on the breach and to confirm that Lambert no longer had access to Dominion's

Litigation Documents.  ECF No. 75 at 11–12.  McGlinchey withdrew from the case before

responding.  *Id.*  When Lambert entered her appearance, Dominion counsel emailed Lambert and

McGlinchey to again request information about the scope of the breach.  *Id.* at 12.  Lambert

responded, but refused to provide the requested information.  ECF No. 75-3.  Instead, she wrote:

> Hi [Dominion Counsel],
>
> I had assumed that you, as counsel, were unaware of the criminal acts contained in
> discovery. These acts include, but are not limited to, perjury, fraud is [sic] services,
> wire fraud, and international interference in an election.
>
> If you were aware of the criminal acts, I will need to address fraud on the court and
> potentially accessory after the fact with threats of violating a protective order that
> does not extend to criminal acts committed by your client.
>
> My client insisted the evidence of criminal acts be provided to law enforcement.
>
> I'm happy to address this with the court.
>
> Please let me know if you need anything else.

---

[6]       Lambert currently faces two sets of felony criminal charges in Michigan for allegedly
attempting to interfere with voting equipment.  On August 3, 2023, Lambert was indicted in
Muskegon County, Michigan on four felony charges related to alleged tampering with voting
systems following the 2020 U.S. election.  ECF Nos. 75 at 14, 75-17, 75-18.  Then, on May 8,
2024, Lambert and her client, Stephanie Scott, a clerk in Adams Township, Michigan, were
indicted on felony charges related to allegedly "mishandling voter data without authorization in
search of fraud."  ECF Nos. 102-16 at 5; 101-1 at 1.  Lambert's conduct described above occurred
in the first of these criminal cases against her.

A.12

Sincerely,
Stefanie

*Id.*

Neither Lambert nor McGlinchey gave Dominion information about the scope of the alleged breach or provided any assurances that Lambert could no longer access Dominion's Litigation Documents. *Id.* On March 14, 2024, Dominion counsel sent letters to managers of document databases that Byrne used for discovery, with a copy to Lambert. ECF Nos. 75-13; 75-14. Dominion notified those database managers of Lambert and Byrne's alleged breach and requested that the managers not allow Byrne and his legal team to access Dominion's Litigation Documents. ECF Nos. 75-13; 75-14. Lambert wrote the database managers on March 15, 2024 and insisted on maintaining access. ECF Nos. 75-15; 75-16. Lambert threatened that "any entity that collaborates with [Dominion] to withhold discovery and to interfere with the disclosure of evidence in the case would be obstructing justice, and would therefore be accessories after the fact to criminal acts." ECF Nos. 75-15; 75-16.

Between December 12, 2023 when Lambert signed the Undertaking and March 12, 2024, Lambert made no effort to raise with Dominion or the Court that she believed the documents were evidence of the "most serious national security crimes that have ever been committed on U.S. soil," as she now claims. ECF No. 103 at 35:7–9, 29:24–25, 46:6–8. Nor did she notify Dominion or the Court that she intended to turn over this "evidence" to "law enforcement[,]" referring to Leaf. *Id.* at 40:17–22 ("Everyone can go to law enforcement and report crimes, and I have an oath and obligation to do that."), 59:11–18. McGlinchey confirmed at the May 16, 2024 hearing ("May Hearing") that, while serving as Byrne's prior counsel, it never sought to lift the Protective Order,

10

to de-designate any documents that were protected under the Order, or to "seek any relief whatsoever from the [P]rotective [O]rder on behalf of Mr. Byrne." *Id.* at 29:7–13.

Instead, Lambert and Byrne unilaterally decided to disclose thousands, if not millions, of Dominion's Litigation Documents to third parties and then promote the public dissemination of the documents through those third parties. *See generally* ECF Nos. 75; 82; 102; 108; 113.

### Dominion's Motion and the March 2024 Hearing

On March 12, 2024, Dominion notified the Court of Lambert and Byrne's alleged breaches and sought the Court's permission to raise this issue at a forthcoming discovery hearing on March 18, 2024 ("March Hearing"). On March 15, 2024, Dominion filed this Motion. ECF No. 75. Dominion only sought relief based on Lambert's actions, but reserved the right to seek additional sanctions based on Byrne's conduct. *Id.* On March 18, 2024, Lambert filed an opposition on behalf of Byrne, shortly before the March Hearing. ECF No. 76. Although Byrne reserved the right to supplement his response, he did not file a timely supplement or seek leave to file a supplement out of time. On March 22, 2024, Dominion filed its Reply. ECF No. 82. Byrne then waited more than a month and ultimately sought leave to file a Sur-Reply on April 24, 2024. ECF No. 93. Over Dominion's objection, the Court granted Byrne's request for leave to file a Sur-Reply. ECF No. 97.

Hours before the March Hearing, Lambert posted the following on X:

A.14



ECF No. 82-5.

At the March Hearing, Lambert did not dispute that she: 1) signed an Undertaking verifying that she would comply with the Protective Order; 2) gained access to Dominion's Litigation Documents; and 3) disseminated those documents in the manner Dominion alleged.  ECF No. 78 at 18:1–15, 19:8–25:18.  She also disclosed details about the scope of her alleged breach for the first time.  *Id.* at 31:19–32:4.  She reported that she not only gave Leaf documents, but that she also *gave him a username and password to the entire repository of Dominion's Litigation Documents*.  *Id.*  Lambert did not represent that she asked Leaf to sign an Undertaking pursuant to the Protective Order.

After Leaf gained access to Dominion's Litigation Documents, Leaf created an X (formerly Twitter) account and shared links so that the public could download the documents.  ECF No. 82 at 6–7.  Leaf's posts sharing the documents remain publicly available.  ECF No. 103 at 18:3–12,

51:4–7.  Leaf also sent a letter to House Judiciary Committee Chair Jim Jordan (R-OH) asking him to investigate Dominion's alleged illegal acts.  ECF No. 82-6.  As of the date Dominion filed its Reply on March 22, 2024, Leaf's post with this letter and the link to "Traunche [sic] One" had been viewed 473,000 times.  ECF No. 82 at 8.  According to Lambert, Byrne had reportedly also provided Dominion's Litigation Documents to a U.S. Attorney and possibly others.  ECF No. 78 at 23:21–24:5.  Although Lambert claimed she did not know the full extent of Byrne's actions, it became apparent that her accounting to the Court of her own actions was incomplete as well.  *Id.* at 23:21–24:25.

Importantly, at no point did Lambert herself notify the Court, Dominion counsel, or McGlinchey that she intended to or had already disclosed Dominion's Litigation Documents.

**Status Quo Order**

At the March Hearing, the Court ordered temporary protective relief to prevent any further dissemination of Dominion's Litigation Documents and other discovery while the Court considered this Motion.  ECF No. 77.  Among other things, the Court ordered Byrne and Lambert to "*immediately desist from sharing, distributing, providing access to or discussing any discovery material*" received in this case and the consolidated/coordinated cases.  *Id.* ¶ 1 (emphasis added).  The Court ordered Lambert to ensure that any individual who had access to Dominion's Litigation Documents or notes Lambert took on them not access or disseminate those materials, and that she sequester and secure the documents and any of her notes.  *Id.* ¶¶ 4. 6.  The Court ordered Lambert to "immediately confer with her counsel" in her Michigan criminal case regarding Dominion's Litigation Documents and "undertake every reasonable effort to remove such documents from the public record and file them under seal instead."  *Id.* ¶ 3.

Further, the Court ordered Lambert, Byrne, and McGlinchey to "preserve all documents and communications relating to the issues raised by Dominion's motion, including but not limited to, the release of any Dominion Litigation Documents in this case to any other entity or individual." *Id.* ¶ 7. Additionally, the Court ordered that, if Dominion's Litigation Documents existed in any form not already accounted for, including with any "associate or affiliate" of Lambert or Byrne, the "relevant party, party's attorney, or party's former attorney must immediately notify the Court." *Id.* ¶ 6.

Finally, the Court ordered that Byrne and Lambert file a "verification . . . that they have and will comply with each of their obligations in this Order until further Order of the Court" no later than March 21, 2024 at 5:00 PM EST. *Id.* ¶ 8. Both of them missed this deadline. *See generally* Docket in Case No. 21-cv-2131. On March 22, 2024, after the deadline had passed, Byrne and Lambert sought to extend the deadline to file their verifications. ECF No. 81. Byrne and Lambert asked the Court to extend this deadline to 5:00 PM on March 26, 2024. *Id.* The Court granted Byrne and Lambert's request but set the deadline at 12:00 PM on March 26, 2024. Again, Byrne and Lambert missed not only the Court-ordered deadline of 12:00 PM, but also their requested deadline of 5:00 PM. Lambert and Byrne did not file the verifications until 8:55 PM that day. Receipt for ECF No. 84. Though belated, Lambert and Byrne submitted statements in which each "verif[ied] that [they] have and will comply with the obligations set forth in the Court's March 19, 2024 Order (Docket No. 77) until further Order of the Court." ECF No. 84.

**Conduct After the March Hearing**

Neither the Court's March Hearing nor the Status Quo Order deterred Lambert or Byrne's continued misconduct. Lambert and Byrne continued to discuss and disseminate the documents

and, in some cases, actively sponsored others' dissemination of the documents.[7]  For example, on March 19, 2024, the day after the March Hearing, Lambert made the following statements to ABC News:

> There was no leak of data . . . I provided evidence of criminal acts to law enforcement. *The Dominion file contained evidence of perjury by John Poulos, Dominion CEO, Honest Service Fraud, Wire fraud, etc.* I'm on my way back to Michigan, and I look forward to truth and transparency for everyone.

ECF No. 82 at 14, n.2 (emphasis added).[8]

Moreover, on March 22, 2024, Lambert appeared alongside Leaf on an interview that was posted on X.  *Id.* at 14.  During the episode of Joe Oltmann's podcast with Conservative Daily News, Oltmann encouraged all listeners to download the Dominion documents Lambert had released to Leaf and send them to every county in the United States.  ECF No. 103 at 13:3–17.  As Dominion counsel recounted at the May Hearing:

> [O]n March 22nd, Ms. Lambert sat for an interview on Joe Oltmann Live, and, in that interview, Mr. Oltmann turns to her at 42:25 and he says, 'We have evidence from Dar Leaf, and way more that has not been released,' and when he starts to discuss the evidence, he hesitates and he turns to Ms. Lambert and he says, quote, 'Stefanie, I didn't get it from you, I got it from Twitter, X,' end quote.  And Ms. Lambert does nothing to stop him from then launching into a discussion of the documents.  In fact, Ms. Lambert follows up by telling Mr. Oltmann that he should have Dar on the show himself, because he can go through the investigation.  And when Mr. Oltmann asks Ms. Lambert if Sheriff Dar Leaf is allowed to discuss his investigation and evidence, Lambert says, 'Sheriff Dar Leaf can do whatever he wants, it's his investigation.'

---

[7]     At the May Hearing, Dominion chronicled instances in which Lambert and Byrne continued to share and discuss the documents after the Status Quo Order.  ECF Nos. 103 at 12–13; 102-3; 102-12; 102-13; 102-14; 102-15.  Lambert and Byrne do not dispute the authenticity of their posts; they merely argue their conduct is permissible.  *See e.g.*, ECF No. 103 at 34:17–25.

[8]     "Laura Romero and Luke Barr, *Pro-Trump lawyer arrested on warrant after court hearing in separate case on Dominion leaks*, ABC News, https://abcnews.go.com/US/lawyer-election-denier-center-dominion-voting-systems-leak/story?id=108270385 (March 19, 2024)."

A.18

ECF Nos. 103 at 13:3–17; 102-9 at 29.  After the Court gave her ample opportunity to explain her conduct, Lambert never contested that she made or shared any of the posts at issue, participated in any of the interviews, or otherwise engaged in the conduct that Dominion asserts violates the Protective and Status Quo Orders.  No. 103 at 34:2–25.

Further, Lambert did not remove or make any meaningful attempt to file under seal the copies of Dominion's Litigation Documents that she had attached to a publicly-available *pro se* filing in one of her Michigan criminal cases.  ECF Nos. 77 ¶ 3; 103 at 10:1–11:12.  Lambert claimed that she raised the issue with her counsel, Daniel Hartman ("Hartman"), but that Hartman "stated that he could not ask the Court in good faith, that the documents contained some of the serious crimes in national history and are a matter of national security."  ECF No. 103 at 29:20–25, 30:4–15.  Lambert did not inform the Court that she failed to comply with this requirement.

For his part, Byrne reposted and continued to emphasize posts on X about Dominion's Litigation Documents despite also promising that he would comply with the Status Quo Order.  On March 18, 2024, he shared Leaf's letter to Rep. Jordan that referenced the documents:

16



ECF No. 82-6.

On March 19, 2024, Byrne reposted a video on X that was originally posted by Tina Peters

("Peters"), a former County Clerk of Mesa County, Colorado who is indicted for allowing

unauthorized access to Dominion machines.[9]  ECF No. 82-10.  In that post, Peters used the name

---

[9]      Although the Court does not grant Dominion leave to file a third supplement, the Court
acknowledges that Dominion alleges that in addition to representing Lambert in one of her criminal

and photo of a Dominion employee in Belgrade, Serbia. *Id.* Dominion asserts, and Lambert does not dispute, that this is a reference to Dominion's Litigation Documents. ECF No. 82 at 12.

On March 20, 2024, Byrne shared another post on X that named a Serbian Dominion employee and claimed connections between Dominion, vote counting software, and Serbia. ECF No. 82-12. Shortly after, Byrne responded to another X post about the source code protocol entered in this case. ECF No. 82-13 (Byrne: "And what is going to be REALLY interesting is comparing that code to the SmartMatics [sic] source code. If only we could get it.").

### May Hearing

On May 16, 2024, the Court held a hearing to entertain more fulsome argument on Dominion's Motion, which had not been fully briefed at the time of the March Hearing. At the May Hearing, Dominion chronicled Lambert and Byrne's actions and argued that Lambert's actions violated the Protective and Status Quo Orders and her ethical obligations as Byrne's counsel. ECF No. 102. This included a detailed presentation in which Dominion offered a timeline of Lambert and Byrne's misconduct using social media posts, interviews and other statements. *Id.*[10] Although Lambert disagreed about Dominion's characterizations of these actions, she did not dispute either the underlying conduct or the authenticity of any of the documents Dominion cited in its presentation. ECF No. 103 at 33:10–35:24.

The Court reminded Byrne and Lambert that the Status Quo Order expressly prohibits them from "sharing, distributing, providing access to or discussing any discovery material received" from Dominion in this case. ECF No. 103 at 60:11–62:25. The Court made clear that the

---

cases, Hartman also represents Peters in her Colorado criminal case and has allegedly sought to introduce Dominion's Litigation Documents as evidence in that case. ECF No. 122.

[10]     The Court ordered Dominion to file its presentation and supporting evidence on the docket by the end of the following day. ECF Nos. 102-1; 103 at 65:13–66:6.

"discovery material" referenced in the Status Quo Order is the same broad definition of discovery material in the Protective Order.  *Id.*  The Court confirmed with both Byrne and Lambert on the record that they understood these orders and would comply with them, especially the provisions prohibiting them from sharing, disseminating, or discussing discovery material.  *Id.*  Both Lambert and Byrne agreed.  *Id.*  The Court also gave both of them multiple opportunities to ask questions about the scope of the orders.  *Id.*  Lambert had no questions.  *Id.*  The only question from Byrne was what he should do if he "is requested by Congress or the DOJ or law enforcement to cooperate with an investigation."  *Id.* at 62:12–14.  The Court reiterated that Byrne and Lambert must come to this Court first.  *Id.* at 62:15–18.  The Court warned the Parties that some of the actions purportedly taken in the name of law enforcement "aren't entirely supported" and reiterated that they "need to follow the strict guidelines of Judge Nichols' order to come to the Court if there are any such requests."  *Id.* at 62:15–23.  Lambert thanked the Court and neither Lambert nor Byrne had any additional questions or apparent reservations.  *Id.* at 62:24.

### Conduct After the May Hearing

Despite assuring the Court that they understood and would comply with all of its orders, Lambert and Byrne continued to disregard them.

For example, the morning after the May Hearing, Byrne shared a post on social media that included screenshots and discussions of Dominion's Litigation Documents.  ECF No. 105.[11]  On May 21, 2024, Dominion notified the Court of Byrne's actions.  *Id.*  On May 28, 2024, Lambert

---

[11]      In the post, the user claimed that Dominion "*authenticated* all of the data released by @SheriffLeaf" in the May Hearing and included screenshots of Dominion's Litigation Documents. ECF No. 105 at 3 n.1 (https://x.com/pjcolbeck/status/1791259014124187903), n.2 (https://x.com/PatrickByrne/status/1791344198215500027), 4 n.3 (https://x.com/pjcolbeck/status/1791290146647593410).

submitted a response on Byrne's behalf.  ECF No. 106.  Lambert did not dispute that Byrne shared

the posts containing Dominion's Litigation Documents, instead arguing:

> Dr. Byrne's posts were nothing more than the reposting of information that had
> already been posted, and did not constitute a violation of this Court's orders,
> precisely because the orders [sic] did not disseminate further information beyond
> that which the Court has already taken account of in its previous orders . . . *Dr.
> Byrne did not post any new information, and the reposts constituted information
> that was already in the public sphere*.  Thus, not only has Mr. Byrne not violated
> the court's direct orders, but he has also not disseminated or published any *new
> information* in contravention thereof.

*Id.* at 1–2 (emphasis added).[12]

In other words, because the documents were already in the public domain *due to Lambert's

own unilateral actions*, Lambert argued that they were no longer subject to the strictures of the

Protective Order.  In making the argument, Lambert relied on an exception to the Protective Order

that did not exist.  Nothing in the Court's Status Quo or Protective Orders shields a Party from

sanctions for reposting or sharing documents already made public due to that Party's own violation

of those Orders.  Moreover, Lambert did not come to the Court to raise this question despite

promising to do so at the May Hearing.  ECF No. 103 at 44:6–22, 45:14–23, 46:3–12.  Instead,

she continued to assert a right to decide unilterally when she and Byrne could share Dominion's

Litigation Documents notwithstanding repeated Court Orders to the contrary.

Lambert did not stop there.  In addition to attempting to excuse Byrne's violations of Court

orders after the May Hearing, Lambert continues to attempt to disclose Dominion's Litigation

Documents and other discovery herself.  ECF Nos. 108; 113.  These events are described in

---

[12]    Lambert claims that Dominion "previously sent only to the Court" its "notice of filing of a
letter" raising this alleged violation.  ECF No. 106 at 2.  This is incorrect, as the ECF receipt from
Dominion's filing shows Lambert received notice of the letter.  Receipt for ECF No. 104.  The
Clerk rejected Dominion's initial filing for being in the wrong format—a letter instead of a
motion—and instructed it to refile, which it did the following day.  ECF Nos. 104; 105.

A.23

Dominion's July 5, 2024 Motion to Enforce the Protective and Status Quo Orders ("Motion to Enforce") and its July 23, 2024 Supplement to its underlying Motion for Protective Relief and to Disqualify Counsel and Motion to Enforce ("Supplement"). ECF Nos. 108; 113. Notably, Byrne and Lambert do not dispute the facts in these briefs.[13]

First, Lambert attempted or threatened to disclose Dominion's Litigation Documents in response to a subpoena in Colorado's criminal case against Peters, *State of Colorado v. Tina Peters*, Case No. 2022-CR-371 (Colo. Dist. Ct.) ("Peters Criminal Case"). ECF No. 108 at 2. On July 1, 2024, Lambert notified Dominion that Peters' attorney subpoenaed Lambert to testify and produce documents in the Peters Criminal Case. *Id.* Paragraph 26 of the Protective Order sets forth procedures for how a Party must handle such a request. ECF No. 75-7 ¶ 26. Dominion responded and asked Lambert to confirm that she and her client would abide by the Protective and Status Quo Orders and not produce documents or other discovery materials to anyone. ECF No. 108 at 3. Lambert disagreed with Dominion's reading of the Protective Order and asserted that it was up to *Dominion* to file objections to the subpoena within forty-eight hours if it wanted to halt her compliance. *Id.* Dominion again pointed Lambert to the plain language of the Protective Order and asked her to confirm that she would comply with the requirement that she object to the subpoena. *Id.* Lambert repeatedly refused to confirm that she had and would comply with her obligations to object. *Id.* at 4. During these email exchanges, Lambert also argued that the

---

[13]     In a one-page response to ECF No. 108, Lambert merely claimed that Dominion fails to request any new relief in its Motion to Enforce; she does not rebut any of the factual grounds for Dominion's Motion. ECF No. 111. Even though she gave no justification for her request, the Court permitted Lambert to file a sur-reply to ECF No. 108 by July 26, 2024. Lambert belatedly filed the sur-reply and vaguely asserted she has and would comply with the Court's Orders but refused to provide confirmation based on privilege. ECF No. 117. The Court permitted Lambert to file a response to Dominion's supplement at ECF No. 113 by July 26, 2024, but Lambert did not file any response, seek any extension, or otherwise indicate she would respond. 07/23/2024 Minute Order.

materials were improperly labeled confidential or AEO, though she had not previously raised that argument in accordance with the process set forth in the Protective Order.  ECF No. 108-12.

Second, Lambert attempted to disclose deposition testimony from Dominion CEO John Poulos ("Poulos") in response to a request from a Michigan State Representative, James DeSana. ECF No. 113 at 7–8.  On July 12, 2024, Lambert notified Dominion that she received a request from DeSana for Poulos' deposition testimony.  *Id.*  Dominion objected to Lambert sharing the testimony on the same grounds as the first subpoena, as depositions clearly fall within the definition of protected discovery materials in the Protective Order.  *Id.*  In response, Lambert asserted that this situation was different as it was "not a person requesting the transcript in his individual capacity. This is a request by the government. The Michigan legislature."  *Id.*  She also asked Dominion to specify which portions of the deposition it objected to her sharing with DeSana, evidently still contesting that the Protective and Status Quo Orders apply to all discovery materials, despite the Court ordering otherwise.  ECF No. 113-9 at 2–3.

As Dominion lays out in its Supplement, this request does not appear to be from the Michigan Legislature through any formal process or request, but instead is an email from an individual legislator.  ECF No. 113.[14]  Dominion also pointed out that even if the request were from a member of the government, that would not "vitiate" the Protective and Status Quo Orders, as the Court expressly warned at the May Hearing.  *Id.*; ECF No. 103 at 62:12–24.  Because Lambert again would not confirm that she would comply with the Protective Order and object to the subpoena, Dominion sought the Court's assistance on July 12, 2024.  The Court entered a minute order reiterating what it had previously ordered: that no discovery materials may be shared

---

[14]     Dominion points out that the Michigan Attorney General already dismissed a request by DeSana and others for the Attorney General to bring a criminal complaint against Dominion three months before.  ECF No. 113 at 8.

to unauthorized individuals without expressly obtaining the Court's permission.   07/12/2024

Minute Order.   The Court expressly prohibited Lambert from sharing Poulos' deposition with

DeSana without obtaining Court approval.   *Id.*   Lambert has not filed any request to lift the

Protective and Status Quo Orders for this purpose.[15]

Finally, it recently came to light that John Case ("Case"), another attorney who represents

Peters in the Peters Criminal Case, is also assisting Lambert with Byrne's defense in this case.

ECF No. 113 at 3.   Lambert never notified Dominion or the Court that Case is at all involved in

this litigation.   Dominion discovered this fact for the first time because Case filed a declaration in

the Peters Criminal Case on July 10, 2024 stating:

> I am assisting Stefanie Lambert in her defense of Patrick Byrne in 1:21-cv-02131.
> I signed Exhibit A to Protective Order, the "Undertaking" in which I agreed to
> "access and use Discovery Material, Confidential Material, and Attorneys Eyes
> Only Material only as the [Protective] Order permits." I reviewed emails produced
> by Dominion in 1:21-cv-02131. The emails appear to be mis-labeled
> "Confidential," because their contents do not meet the definition of "Confidential
> Material" in paragraph 2 of the Protective Order 6/16/23.

ECF No. 113-4 at 3.   Lambert refused Dominion's request for information about when Case joined

Byrne's defense and what discovery he has accessed because of "privilege/work product."   ECF

No. 113-5.   She even objected to providing the Undertaking that Case supposedly signed to gain

access Dominion's Litigation Documents.   *Id.*   Nor has Lambert provided any details to the Court

about Case's involvement, despite the Court directly requiring Lambert to give a full accounting

of who had access to Dominion's Litigation Documents.   ECF Nos. 77 ¶¶ 1, 6; 78 at 35:8−36:16.

Case's involvement in this litigation is not only striking because Lambert hid this

information from the Court.   Case has also attempted to use processes from other judicial

---

[15]      Instead, on July 19, 2024, Lambert filed a motion for leave to file an emergency motion to
lift the Protective Order for the specific purpose of producing documents in the Peters Criminal
Case.   ECF Nos. 110 (not attaching the proposed motion to her filing); 116.

proceedings, such as the Peters Criminal Case, to access and release Dominion's discovery materials from this litigation. ECF No. 113 at 3. This includes the subpoena to Lambert that is the subject of Dominion's Motion to Enforce. ECF No. 108. In summary, while Case is ostensibly working with Lambert to advise Byrne on this case and signed an Undertaking to comply with the Protective Order, he is also seeking to use Dominion's Litigation Documents and other discovery in contravention of this Court's orders. Lambert is at least justifying, if not also facilitating, his efforts.

### Impact of Lambert and Byrne's Actions

Because of Lambert and Byrne's actions, Dominion's Litigation Documents are now widely available to the public. As Dominion points out, the documents and related commentary have been viewed hundreds of thousands of times. ECF No. 82. For example, on March 18, 2024, former U.S. National Security Advisor Michael Flynn retweeted Leaf's letter to Rep. Jordan. ECF No. 82-14. As of Dominion's March 22, 2024 filing, Flynn's tweet was viewed 887,200 times. ECF No. 82 at 15. In a March 18, 2024 tweet, the Election Integrity Force shared a link to Dominion's Litigation Documents. *Id.* This tweet was viewed 121,600 times as of March 22, 2024. *Id.* (citing ECF No. 82-15). Another tweet suggesting Lambert's arrest after the March 18, 2024 hearing was related to her leak of the Dominion documents instead of her open bench warrant in Michigan has more than one million views. *Id.* (citing ECF No. 82-16); *see also* ECF No. 102-3 at 10 (Byrne: "Stefanie gave a whiff of that to Sheriff Dar Leaf in a criminal investigation and she ended up leaving the court in leg iron.").

Lambert and Byrne's actions have led to serious threats to Dominion and its employees. For example, a Dominion employee in Belgrade was "doxed" in a video posted to X which Byrne

retweeted.  ECF No. 82 at 16–17 (citing ECF No. 82-10).[16]  Another Dominion employee's work

address in Denver was posted online after being pulled from the leaked documents.  *Id.* at 17.

Another X user shared a letter from Leaf and added:

> HUGE!!  We'll be adding to this over the weeks.  Dominion President John Poulos
> [,] you're going to be arrested, tried and if convicted by a jury, hung for sedition.  I
> dare you to sue me you crook.  Dominion voting machines rig elections - we have
> proof.

ECF No. 75-2.  As Lambert and Byrne continue to promote the dissemination of Dominion's

Litigation Documents and other discovery, threats persist:



ECF Nos. 113 at 7; 113-7.

### Lambert's Prior Election-Related Conduct and Admonishments

Dominion asserts that Lambert has a "vendetta against Dominion and . . . disregard for the

rule of law."  ECF No. 75 at 13.  Regardless of Lambert's motivations, it is clear that before she

entered her appearance in this case, she has shown a concerning pattern of conduct that gives the

Court further pause that she would follow its orders.

For example, in Pennsylvania, Lambert was involved in litigation related to two Fulton

County commissioners' decision to allow unauthorized access to and copying of voting systems

and data.  *Cnty. of Fulton v. Sec'y of Commonwealth*, 292 A.3d 974 (Pa. 2023).  Lambert was

---

[16]    "To dox someone means to release their personal or private information that may prove
harmful or embarrassing."  Rob Lever, *What Is Doxxing?*, U.S. NEWS & WORLD REPORT (Dec. 16,
2021) https://www.usnews.com/360-reviews/privacy/what-is-doxxing.

never admitted as counsel in the case because the court repeatedly rejected her *pro hac vice* applications. *Id.* In its decision affirming sanctions for other attorneys, the Pennsylvania Supreme Court remarked:

> Attorney Lambert may be every bit as culpable as Attorney Carroll, at least in the pattern of non-compliance that has led us to impose upon him joint and several responsibility with the County. That said, perhaps ironically, we must conclude that the failure by the two lawyers to convince the Special Master that Attorney Lambert should be admitted pro hac vice precisely because she failed to satisfy the requirements for applying for that status protects her from sharing responsibility with Attorney Carroll and the County. Had she gained admission, the result might have been different.

> But we are not powerless to call attention to Attorney Lambert's own role in the misconduct highlighted above. In *King*, the judge referred Attorney Lambert and co-counsel to disciplinary review both in Michigan and anywhere else they were licensed. We will do the same, transmitting a copy of this Opinion to the Michigan Attorney Grievance Commission.

*Id.* at 1018–19.

In Georgia, Lambert was mentioned in litigation related to the 2020 election and Dominion Voting Systems. *See Curling v. Raffensperger*, Case No. 1:17-cv-2989-AT, 2023 WL 7463462, at *23–24 (N.D. Ga. Nov. 10, 2023). Advocacy organizations and voters challenged state and county officials' implementation of new voting systems and ongoing use of other voting systems, software, policies, and practices as infringing their right to vote and have their ballots be reliably counted under the First and Fourteenth Amendments. *Id.* at *1–5. The U.S. District Court for the Eastern District of Georgia found that Lambert had directed the transmission of a disc drive with material from the Coffee County Elections Office, which uses Dominion systems, to a private investigator and digital security firm. *Id.* Due to these and similar actions, a cybersecurity expert, Dr. Alex Halderman, opined that it was "impossible to determine the number of people or entities that [had] copies of the Coffee County software and data . . . *Id.* at *24. As a result, "because of these outside groups and individuals copying and distribution of the proprietary software that

26

operates Georgia's election system and specific system configurations the risk that a future Georgia election will be attacked has materially increased." *Id.* (internal quotation marks omitted).

Lambert's conduct in these cases reflects a concern that she has a personal stake in advancing her claims against Dominion, and that personal stake overrides her regard for court orders and rules even in the face of such admonishment.

**ANALYSIS**

Dominion argues that Lambert and Byrne flagrantly and repeatedly disregarded court orders by leaking Dominion's Litigation Documents to the public; there is no justification for these acts; these acts have continued to harm Dominion and its employees; and that, importantly, Lambert's continued involvement in this case would infect future proceedings, including by making it impossible to continue the discovery process.  ECF Nos. 75; 78; 82; 103; 105; 108; 113; *see also Koller*, 737 F.2d at 1056.  As a result, Dominion asks the Court to disqualify Lambert from this case as a sanction for her misconduct.  ECF Nos. 75; 82; 108; 113.  Lambert and Byrne dispute these arguments, asserting they did not violate any orders or rules and that, even if they did, their actions were justified.  ECF Nos. 76, 97, 106, 111, 117.

There are four questions for the Court: 1) whether the Protective Order applies to the documents Lambert and Byrne disclosed to third parties; 2) whether and to what extent Lambert violated any rules, law, or Court orders; 3) whether—if Lambert did violate rules, law, or orders— there is any justification for her actions; and 4) whether to disqualify Lambert.  The Court bases its conclusions below on Lambert's conduct.  Byrne's conduct, however, is relevant because Lambert refuses to ensure he complies with the Court's orders and, instead, attempts to justify his blatant violations with meritless and rejected arguments.

27

## I.  Scope of Protective Order

### A.  Legal Standard

Federal Rule of Civil Procedure 26(c) provides that a court may enter a protective order upon motion if there is good cause.  Fed. R. Civ. P. 26(c); *see also Münchener Rückversicherungs-Gesellschaft Aktiengesellschaft in München v. Northrop Grumman Risk Management Inc.*, 312 F.R.D. 686, 690 (D.D.C. 2015) [hereinafter *Münchener*] ("Protective orders both facilitate efficient pre-trial discovery and prevent parties from abusing Rule 26's liberal discovery provisions."); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984).

This Court enforces protective orders consistent with their language.  *See, e.g.*, *Pigford v. Veneman*, 307 F. Supp. 2d 51, 55 (D.D.C. 2004) (holding that class counsel violated a protective order by disclosing certain documents to pro bono counsel when the protective order only permitted disclosure of documents from the government).  If a protective order "broadly prohibits disclosure of *any* materials obtained during discovery for any purpose other than litigation and to any person other than those associated with the litigation," disclosure of documents beyond that scope violates the protective order.  *Dialog Information Servs., Inc. v. American Chemical Soc.*, Case No. 90-cv-1338, 1991 WL 283718, at *2 (D.D.C. Dec. 19, 1991).

### B.  The Protective Order Covers Dominion's Litigation Documents

There is no reasonable dispute that the Protective Order governs Dominion's Litigation Documents.  Byrne and Lambert concede that a protective order is generally interpreted according to its plain language.  ECF No. 76 at 20.  They assert, however, that because Dominion discussed needing to protect trade secrets and proprietary information in a motion requesting a separate protective order, the Third-Party Protective Order, the Court should interpret the operative Protective Order in this case *inconsistent* with its plain language.  *Id.* at 21 (citing ECF No. 145 in

28

Case No. 21-cv-445) (asserting that "Dominion's motion for a protective order targets a very specific situation and sought to encompass only very specific, technical information – 'trade secrets,' 'proprietary information,' and 'confidential information' pertaining thereto."). Dominion responds that Byrne and Lambert's argument is based on a fundamental misunderstanding of the two separate protective orders. ECF No. 82 at 21–22.

The Court agrees with Dominion. It is clear from the record that, after the Parties negotiated a comprehensive Protective Order that applies to any Party-produced discovery, Dominion asked the Court to enter a separate protective order in the *MyPillow* litigation tailored to third-party discovery. *Compare* ECF Nos. 152 *with* 159 in Case No. 21-cv-445. There is no support for the conclusion that the *MyPillow* Third-Party Protective Order displaces this Protective Order or limits its scope. If there were any doubt, it would be resolved by Byrne's own stipulation and Joint Motion asking the Court to enter this Protective Order, noting that it "prohibits persons or entities receiving Discovery Material produced in the Consolidated Cases from using those Discovery Materials outside of those three cases, except as specifically provided by the Order." ECF No. 45 at 2–3. Moreover, prior to sponsoring Lambert's dissemination of documents subject to the Protective Order, Byrne never took the position that the Order was limited in any way.

Lambert and Byrne's argument here is not only meritless, it borders on frivolous, purposefully ignores contrary evidence and authority, and contradicts Byrne's own representations to the Court in his June 2023 stipulation.[17]

---

[17]     Byrne and Lambert have had ample opportunity to correct their clearly implausible argument. ECF Nos. 86; 90; 97. Instead of addressing what can generously be seen as a misunderstanding of the docket, Byrne and Lambert have doubled down. ECF No. 116. They did so even after Dominion explained how Byrne's reliance on ECF No. 145 in 21-cv-445 was plainly wrong. ECF No. 82. Lambert even continued to advance this theory at the May Hearing and claimed: "My client did not agree to false labels being placed on the documents by Dominion." ECF No. 103 at 37:7–8. This is again clearly contradictory to the joint stipulation.

## II.     Violations of Rules, Laws, and Orders

### A.  Lambert Has Violated the Court's Orders

Dominion asserts that, through her actions, Lambert violated multiple rules and court orders, including D.C. Rule of Professional Conduct ("DCRPC") 3.4(c), DCRPC 8.4(d), the Protective Order, and the Status Quo Order.  Lambert does not dispute that she committed the acts at issue; she argues instead that that her actions were permissible.  Apart from the alleged violations of DCRPC 8.4(d), Dominion discussed these violations in its briefing at ECF Nos. 75, 82, 96, 105, 108, and 113.  Specifically, Dominion alleges that Byrne and Lambert violated ¶¶ 1, 8, 11, 15, 26, and 27 of the Protective Order, and ¶¶ 1, 3, 6, 7, and 8 of the Status Quo Order.  Because Lambert's alleged violations have been ongoing, Dominion introduced recent evidence of such actions at the May Hearing and have supplemented with additional evidence since then.  ECF Nos. 102-1; 105; 108; 113.  At the May Hearing, Dominion also discussed how Lambert allegedly made multiple misrepresentations to the Court, conduct which violates DCRPC 8.4(c).  The Court has permitted Lambert to respond to these allegations, and Lambert continues to maintain that her actions were permissible, justified, and necessary to report evidence of an allegedly grave crime.  ECF Nos. 76, 97, 106, 111, 117.  In the past two weeks, Dominion has sought leave to file two additional supplements detailing additional alleged misconduct.  ECF Nos. 118; 122.  Despite the severity of the conduct alleged therein, the Court denies Dominion's latest motions to supplement in the interests of ending the ongoing cycle of alleged misconduct by resolving this underlying Motion.

### 1.  Violations of Protective Order

Lambert and Byrne have violated a number of the provisions of the Protective Order.  ECF No. 77 ¶¶ 1, 8, 11, 15, 16, 26, and 27.

First, Lambert and Byrne disclosed and promoted the public dissemination of Dominion's Litigation Documents in a manner the Protective Order does not authorize. ECF Nos. 75 at 9–12, 82 at 6–17. The Protective Order prohibits disclosure of discovery outside of the Parties to the litigation and, even within those parameters, limits the purposes for which confidential material may be used. ECF No. 75-7 ¶¶ 1, 8. Lambert violated these provisions by attaching to a pleading in her criminal case in Michigan a declaration from Leaf that included Dominion's Litigation Documents as exhibits, providing Leaf with access to the document repository, and sharing social media posts that include the disclosed documents. *Id.*

Second, they did not notify Dominion that they intended to disclose any Confidential Discovery Material prior to disclosing it or schedule a time to meet and confer on the proposed objections to the documents.[18] These were documents Dominion had produced that it reasonably believed would be handled pursuant to the terms of the Protective Order. ECF No. 75-7 ¶¶ 15, 16. Third, Lambert and Byrne failed to come to the Court, as the Protective Order expressly requires in the event of an objection, to seek an Order de-designating the documents or allowing Lambert to disseminate these documents to a third party. *Id.*

Fourth, Byrne and Lambert did not immediately notify Dominion once they disclosed Dominion's Litigation Documents. ECF No. 75 at 12–13. It is notable that Lambert and Byrne even failed to notify McGlinchey—who represented Byrne at the time they began to make the disclosures—that Byrne or Lambert planned to and ultimately did disclose Dominion's documents. McGlinchey only learned about Byrne and Lambert's actions when they saw a social media post

---

[18]   There is no dispute that Lambert and Byrne disclosed "Confidential" documents, in addition to other documents covered by the Protective Order. First, Lambert admits to giving Leaf access to the *entire repository* of Dominion's Litigation Documents. ECF No. 78 at 31:19–32:4. Second, all of the documents attached to Leaf's declaration that Lambert filed *pro se* in her Michigan criminal case were stamped "Confidential." ECF No. 75-8 at 5–63.

31

about Dominion's Litigation Documents.  It was not until this point that McGlinchey, not Lambert or Byrne, notified Dominion of the breach.  *Id.*  In addition, Lambert refused to answer Dominion's questions about the scope of her breach.  *Id.*; ECF No. 75-3.  Instead, she threatened that "if [Dominion counsel] were aware of the criminal acts, I will need to address fraud on the court and potentially accessory after the fact with threats of violating a protective order that does not extend to the criminal acts committed by your client."  ECF No. 75-3.  Lambert and Byrne's conduct here violates Paragraph 27 of the Protective Order.  ECF No. 75-7.  Lambert only provided information about the scope of her possession and disclosures of the documents when the Court questioned her at the May Hearing.  And now, it is clear that Lambert has still not disclosed the full list of individuals with whom she shared Dominion's Litigation Documents.  ECF No. 113 at 3 (describing Case's involvement in this litigation); ECF No. 113-4 at 3.

Fifth, Lambert has apparently refused to object to subpoenas that she has received for Dominion's Litigation Documents.  ECF Nos. 108 at 2, 3; 113 at 7, 8.  Even though the Protective Order clearly requires a person to object to subpoenas on the grounds of the Order's existence, Lambert has repeatedly refused to confirm that she would do so.  ECF Nos. 77 ¶ 26; 108 at 2, 3; 113 at 7, 8.  Lambert does not assert that she has objected to these subpoenas.  Instead, she vaguely maintains that she will comply with the Protective Order.  ECF Nos. 108-8; 117.  This promise instills little confidence moving forward, as Lambert continues to rely on an interpretation of the Protective Order that the Court has rejected.

### 2.  Violations of Status Quo Order

Lambert and Byrne have also violated the Court's Status Quo Order, despite both verifying that they had and would comply with it.  ECF No. 84.  The Court will save for another day the absurdity of needing to require a barred attorney to independently verify that she will follow a

Court Order.  To date, Lambert and Byrne have violated at least five of the eight specific requirements of the Status Quo Order: ¶¶ 1, 3, 6, 7, 8.

First, as discussed, Lambert and Byrne missed multiple deadlines to submit their verifications.  Notably, they only asked for an extension after their first deadline had passed.  The delay in submitting the verification matters because Byrne continued to publicly discuss and share Dominion's documents in that time (and after).  ECF Nos. 102-1 at 20; 103 at 11:13–12:14.  And the delayed failure to comply with the Court's deadline is another example of Lambert and Byrne's cavalier disregard for the judicial process in this case.

Second, regarding the filing in one of her criminal cases, Lambert did not "immediately confer with her counsel in that matter and undertake every reasonable effort to remove such documents from the public record and file them under seal instead."  ECF Nos. 77 ¶ 3; 103 at 10:1–11:12, 29:20–25, 30:4–15 (claiming that her counsel was unwilling to remove Dominion's Litigation Documents from the public docket in Michigan because he believed, like Lambert, they should remain publicly available.).  Lambert made no effort herself to remove the documents from public access or raise the issue with the Michigan court, despite having filed them *pro se*.  ECF Nos. 102-2; 103 at 10:1–11:12, 29:20–25, 30:4–15.  Nor did she notify the Court or Dominion of her unilateral decisions to keep the documents on that public docket.  ECF Nos. 77 ¶ 3 (Status Quo Order requirement); 84 (verifying Lambert had and would comply with all Status Quo Order requirements); 103 at 10:1–11:12 (explaining how Dominion learned Lambert did not remove the documents from the public docket).

Third, Byrne and Lambert have continued to share or sponsor the dissemination of the documents publicly.  ECF Nos. 77 ¶ 1; 103 at 12:15–22.  For example, on March 19, 2024, Lambert discussed the documents with ABC News, which quoted her as saying "[t]he Dominion file

contained evidence of perjury by John Poulos, Dominion CEO, Honest Services Fraud, Wire Fraud, etc." ECF Nos. 102-1 at 21; 103 at 12:23–13:2. On March 22, 2024, Lambert was a guest on a podcast during which host Joe Oltmann discussed the documents. ECF Nos. 102-1 at 22; 103 at 13:3–17. When Oltmann asked whether Leaf was allowed to discuss his "investigation," which is based on Dominion's documents, Lambert said Leaf could go through whatever he wanted. ECF No. 103 at 13:3–17, 45:11–13. On April 7, 2024, Lambert gave an interview on "The Joe Hoft Show" on FrankSpeech. ECF Nos. 102-1 at 23; 103 at 13:18–14:7. The title of the episode was "Surviving Attacks for Standing Up for Fair Elections with Stefanie Lambert," and Lambert again discussed the documents she had disseminated. ECF Nos. 102-1 at 23; 103 at 13:18–14:7.

These actions remain ongoing. Immediately after Lambert and Byrne promised they would follow the Protective and Status Quo Orders, claimed to understand when the Court reiterated the broad scope of the Orders, and promised to seek Court guidance if there was any confusion, Byrne continued to share social media posts with and about the documents and Lambert attempted to justify his conduct. ECF Nos. 105; 106; *see also* ECF Nos. 108; 113. Significantly, neither Lambert nor Byrne meaningfully contest any of Dominion's evidence in support of its Motion. Lambert and Byrne do not, for example, contest the authenticity of their posts or re-posts on social media, interviews, appearances on various interviews or podcasts, etc. Nor have they argued that they did not participate in the conduct alleged or that any of the posts or statements are taken out of context.

Fourth, Lambert failed to "preserve all documents and communications relating to the issues raised by Dominion's motion, including but not limited to, the release of any Dominion Litigation Documents in this case to any other entity or individual." ECF No. 77 ¶ 7. Lambert admitted at the May Hearing that she viewed part of a video that Byrne posted on social media on

34

April 3, 2024, in which Byrne ostensibly discussed this case and/or Dominion's Litigation Documents. ECF No. 103 at 47:2–48:10. Lambert represented to the Court that she directed Byrne to remove the video from social media. *Id.* Lambert did not ensure that she or Byrne preserved the video and has not provided the video to Dominion despite repeated requests. *Id.* By the time of the May Hearing, it appeared that the video no longer existed. *Id.* Lambert's failure to preserve the video she directed her client to remove from social media renders the Court unable to assess whether Byrne's statements violated the Court's Orders. Based on her conduct and lack of candor with the Court, it appears this is entirely what Lambert was hoping to achieve. *Id.* at 48:6–10 (Lambert stating that she does not have time to "babysit" Byrne's social media).

Fifth, Lambert failed to notify the Court if any other associate or affiliate had access to Dominion's Litigation Documents, as required in Status Quo Order ¶ 6. On July 10, 2024, Case submitted a declaration in the Peters Criminal Case representing that he was an attorney assisting with Byrne's defense in this litigation, had signed an Undertaking to comply with the Protective Order, and had reviewed Dominion's Litigation Documents. ECF No. 113-4 at 3. Lambert did not notify the Court of Case's involvement or access to Dominion's Litigation Documents. Instead, after Dominion independently discovered that Case had access to its documents, Lambert refused to provide any details about Case's involvement. ECF No. 113 at 5.

### B. Lambert Has Violated the Rules of Professional Conduct

#### 1. Standard

The DCRPC, as adopted by the District of Columbia Court of Appeals, govern attorney conduct in this Court. LCvR 83.15(a). Attorneys practicing in this Court are subject to discipline for violations thereof. *Id.* DCRPC 3.4(c) prohibits a lawyer from "[k]nowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no

valid obligation exists." D.C. R. Prof. Conduct 3.4(c). DCRPC 8.4(d) prohibits a lawyer from "[e]ngag[ing] in conduct that seriously interferes with the administration of justice." D.C. R. Prof. Conduct 8.4(d). The D.C. Court of Appeals has interpreted DCRPC 8.4(d) to require showing: (1) an attorney's conduct was improper; (2) it "bears directly upon the judicial process"; and (3) it taints the judicial process in more than a de minimus way, or "at least potentially impact[s] upon the process to a serious and adverse degree." *In re Dobbie*, 305 A.3d 780, 809–10 (D.C. 2023) (internal quotations omitted). DCRPC 8.4(c) prohibits attorneys from making misrepresentations to the court. D.C. R. Prof. Conduct 8.4(c).

### 2. Lambert's Misrepresentations to the Court

Lambert has made many misrepresentations and misstatements to the Court. First, during the March Hearing, Lambert represented that her attorneys had publicly filed the motion in her Michigan criminal case attaching Dominion's Litigation Documents, when in fact it was Lambert herself who filed the motion *pro se*. ECF No. 78 at 46:6–21 (clarifying how the documents were submitted: "THE COURT: Okay. So they were filed by your counsel? MS. LAMBERT JUNTTILA: Correct."). This misrepresentation is significant, as Lambert attempted to mischaracterize the facts to reflect that she was less involved in one of the first public disclosures of Dominion's documents. *Id.* at 43:24–44:4 ("That was not my filing; that was an affidavit from the Sheriff.").

Second, at the March Hearing, Lambert represented to the Court that the only two people who had access to the relevant materials—Dominion's documents and her related notes—were her "assistant" Stephanie Scott and Russell Newman, another attorney in Lambert's office. ECF No. 78 at 35:8–36:16. The Court and Dominion learned through McGlinchey's filing on March 29, 2024, nearly two weeks later, however, that another alleged attorney for Byrne named Michael

Smith also had access.  ECF No. 85 at 4.  The Court also later learned that Lambert failed to advise the Court that Ms. Scott was not just an assistant to Ms. Lambert, but is also the former Clerk of Adams Township, Michigan and Lambert's co-defendant in her pending felony criminal case in Hillsdale County, Michigan.  Ms. Scott and Lambert face charges for allegedly "mishandling voter data without authorization in search of fraud."  ECF Nos. 102-16 at 5; 101-1 at 1.

As discussed above, the Court learned through Dominion's Supplement that there is another attorney assisting with Byrne's defense, Case.  ECF No. 113.  If Case was involved at the time of the March and May Hearings, Lambert misrepresented to the Court the entire universe of people with whom she shared Dominion's Litigation Documents.  ECF No. 78 at 35:1–36:23.  If Lambert gave Case access to Dominion's Litigation Documents after those hearings, she violated the Status Quo Order.  ECF No. 77 ¶¶ 1, 6.  Because Lambert refuses to provide any information on Case's involvement, the Court has no way of assessing which is true.  In either scenario, however, Lambert has made material omissions to the Court.

Third, in her verification that she and Byrne had and would comply with all provisions of the Status Quo Order, Lambert misrepresented that she and her client had complied with the Order.  ECF No. 84.  Lambert ultimately filed the verification on March 26, 2024, after engaging in much of the conduct described above.  *Id.*  For example, Lambert represented that she had and would "undertake every reasonable effort to remove such documents from the public record and file them under seal instead" in one of her criminal prosecutions in Michigan.  ECF Nos. 77 ¶ 3; 84.  Yet, Dominion presented evidence from the prosecutor in that case that neither Lambert nor her counsel attempted to place the documents under seal.  ECF No. 102-2.  Only after Dominion brought this matter to the Court's attention did Lambert admit that she did not remove this public filing.  ECF No. 103 at 29:16–30:15 (asserting her counsel told her not to remove it).  Even if Lambert had a

legitimate reason to disregard the Court's order (the Court has yet to hear one), she still misrepresented to the Court that she had complied with this requirement. ECF Nos. 77, 84.[19]

In addition, Lambert represented that she had and would comply with the requirement in the Status Quo Order that she not share, distribute, provide access to, or discuss the documents. ECF Nos. 77 ¶ 1; 84. But Lambert signed this verification after she had already violated it by giving an interview in which she discussed the evidence she believed existed in the Dominion documents. ECF Nos. 102-1 at 21; 103 at 12:23–13:2. After signing the verification, Lambert continued to publicly discuss the documents. ECF Nos. 102-1 at 23; 103 at 13:18–14:7.[20]

Finally, as discussed above, Lambert assured the Court at the May Hearing that, going forward, she would come to the Court if there were any questions about what she or her client could do with the documents under the Protective and Status Quo Orders. ECF No. 103 at 44:6–22, 45:14–23, 46:3–12. Byrne was physically present at this hearing and ostensibly heard Lambert's promises, having himself agreed to comply with the Orders moving forward. *Id.* at 61:20–25. Only one day later, however, Byrne reposted screenshots of Dominion's Litigation Documents to his hundreds of thousands of followers on X. ECF Nos. 105, 106. Byrne has not removed this post as of the issuance of this Memorandum Opinion. Lambert not only did nothing to address Byrne's blatant violation, she has continued to justify his actions. ECF No. 106.

---

[19]     Even if Lambert had offered legitimate grounds to keep the motion from her criminal case itself publicly available, this still does not explain why she would need to keep the attachment of Leaf's affidavit with Dominion's Litigation Documents included as exhibits also publicly accessible. As Dominion argues, Lambert's conduct here also implicates DCRPC 3.3, which imposes upon counsel a duty of candor to the Court. ECF No. 103 at 53:23–54:14.

[20]     As the Court reminded the Parties at the hearing, the Protective and Status Quo Orders do not prevent the Parties or Counsel from discussing or criticizing the case in general, whatever their views may be. Therefore, the Court did not fault or prohibit Byrne from making statements related to issues presently before this Court, about the Court, Dominion, or this litigation generally.

The Court will not belabor this point by chronicling Lambert's other apparent misrepresentations.  Suffice it to say that Lambert's misrepresentations reflect a deeply concerning pattern that does not appear to have any sign of stopping.  *Compare* ECF No. 75-3, *with* ECF No. 102-3 at 10 (differing accounts of whether it was Lambert or Byrne that insisted on disclosing Dominion's Litigation Documents); *compare* ECF No. 25, *with* ECF No. 103 at 45:5–9 (differing representations of whether Byrne anticipated Dominion's Litigation Documents would unveil evidence of national security or election crimes).

### 3.  Lambert's Conduct Violates the DCRPC

First, DCRPC 3.4(c) prohibits an attorney from "[k]nowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."  D.C. R. Prof. Conduct 3.4(c).  As discussed above, Lambert repeatedly violated the Court's the Protective Order and Status Quo Orders.  Those violations likewise constitute violations of Rule 3.4(c) for all the same reasons discussed above.  Specifically:

- Lambert failed to notify Dominion that she planned to disclose any of Dominion's Litigation Documents prior to disclosing them and arranging a time to meet and confer, as required by the Protective Order.  ECF No. 75-7 ¶¶ 15, 16.

- Lambert failed to raise her objections with the Court and seek an order de-designating documents or allowing her to disclose the documents to a third party, as the Protective Order permits.  *Id.*

- Lambert publicly disclosed and promoted public dissemination of Dominion's Litigation Documents in a manner not permitted by the Protective Order.  *Id.* ¶ 1.

- Lambert refused to confirm that she would object to subpoenas as required by the Protective Order.  *Id.* ¶ 26.

- Lambert failed to immediately, or even at all herself, notify Dominion, McGlinchey, or the Court after she disclosed the documents, as required by the Protective Order. *Id.* ¶ 27.

- Lambert failed to provide information about the scope of her actions and the breach as required by the Protective Order. *Id.* ¶ 27.

- Lambert failed to timely sign and file a verification she had and would comply with the Status Quo Order, as required by that Order. ECF Nos. 84; 77 ¶ 8.

- Lambert failed to immediately confer with her counsel and undertake every reasonable effort to remove Dominion's Litigation Documents from the public docket in one of her criminal cases in Michigan, as required by the Status Quo Order. ECF No. 77 ¶ 3.

- Lambert continued to "shar[e], distribut[e], provid[e] access to or discuss[]" Dominion's Litigation Documents, as prohibited by the Status Quo Order. *Id.* ¶ 1; ECF Nos. 102-1 at 21–23; 103 at 12:15–14:7, 45:11–13.

- Lambert failed to preserve all documents related to the issues raised by Dominion's motion, as required by the Status Quo Order. ECF No. 77 ¶ 7.

- Lambert failed to immediately notify the Court that other associates or affiliates had access to the documents, as required by the Status Quo Order. *Id.* ¶ 6.

Although Lambert may argue that she violated the orders based on her assertion that no valid objection existed, any such argument is unavailing. As discussed below, Lambert has never offered a valid objection to either Order. Lambert has squandered any opportunity to defend her actions, claiming that she has no authority to support her conduct because there are no cases which stand for the proposition that "water is wet." ECF No. 103 at 40:7, 46:23, 59:15. Even if a valid

40

objection to the Orders existed, Lambert at the very least acted in bad faith in the manner in which she disclosed the materials. If she had a valid objection, she would have first raised her objections with the Court instead of waiting until she caused irreparable damage by releasing Dominion's Litigation Documents. Moreover, she confirmed at the May Hearing that she would comply with all of her obligations going forward and did not dispute the provisions in the Status Quo Order, further underscoring her lack of any valid objection to the orders. ECF No. 103 at 60:11–62:25. As set forth above, she promptly disregarded that Order shortly after making that statement.

Second, DCRPC 8.4(c) prohibits attorneys from "engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation. D.C. R. Prof. Conduct 8.4(c); *see also In re Ukwu*, 926 A.2d 1106, 1111–14 (D.C. 2007) (holding that an attorney violated DCRPC 8.4(c) by conduct including "directing a client to file with the IRS a letter containing representations that [the lawyer], at a minimum, should have known were false . . ."). As chronicled above, Lambert has repeatedly made misrepresentations to this Court by:

- Representing that her attorney filed a motion with Dominion's Litigation Documents on a public docket in Michigan instead of her having filed the materials *pro se*. ECF No. 78 at 46:6–21.

- Representing that only two people had access to Dominion's Litigation Documents through working with her, when in fact at least a third attorney also had access. *Id.* at 35:8–36:16; ECF No. 85.

- Representing that she had informed the Court of any "associate or affiliate" who had access to Dominion's Litigation Documents and would immediately inform the Court if others had access to the documents while withholding Case's involvement from the Court. ECF Nos. 77 ¶ 6; 84; 113-5.

41

- Representing that she and Byrne had and would comply with all of the provisions of the Status Quo Order, despite the numerous violations discussed above.  ECF No. 84.

- Representing that she would come to the Court to seek guidance if she thought an exception to the Protective Order or Status Quo Order existed *before* she or her client took any action on the proffered exception, but failing to follow through on the promise.  ECF Nos. 103 at 44:6–22, 45:14–23, 46:3–12; 105; 106.

Third, DCRPC 8.4(d) prohibits attorneys from "engag[ing] in conduct that seriously interferes with the administration of justice."  D.C. R. Prof. Conduct 8.4(d).  The Comment to DCRPC 8.4(d) includes failing to comply with court orders as conduct that seriously interferes with the administration of justice under DCRPC 8.4(d).  Comment to D.C. R. Prof. Conduct 8.4(d) ("Paragraph (d)'s prohibition of conduct that 'seriously interferes with the administration of justice' . . . include[s] acts by a lawyer such as . . . failure to obey court orders").  As explained above, Lambert's conduct was clearly improper in that she repeatedly violated court orders and made misrepresentations to this Court.  *See In re Dobbie*, 305 A.3d at 809–10.  Lambert's conduct bears directly on the judicial process, including the Court and Parties' abilities to oversee and engage in discovery, presume other attorneys will comply with their ethical obligations, and rely on Parties following court orders.  *Id.*  The impact that Lambert's misconduct has had on this proceeding is severe, compounding, and shows every sign of continuing if she were permitted to remain counsel in this case.  *Id.*[21]

---

[21]    Although there is limited case law in this Court about when a DCRPC 8.4(d) violation occurs, especially under similar facts to the present case, the D.C. Court of Appeals has recognized violations for less serious conduct, for example, failing to appear at a hearing or interview when an attorney knew or should have known that they would be expected to appear.  *See In re Ukwu*, 926 A.2d at 1143–44.

A.45

To put it simply, given her conduct, the Court has no confidence that Lambert will comply with the Court's Orders past or future. The record amply supports the Court's serious concern that, instead, Lambert will continue to engage in tactics which taint and disrupt this judicial process. And it is not only the Court who cannot trust her tactics moving forward. Other Parties to the litigation cannot be sure that she will abide by the very agreements her client made (such as the Protective Order), having already flouted them in the most egregious manner.

### III.   Lambert's Justification for Violating Court Orders

None of the justifications Lambert has offered for her conduct, which as noted above is largely undisputed, excuse her actions as Byrne's counsel of record.

#### A.  Lambert's Arguments

Lambert first argues that Dominion brought this Motion in bad faith to target her. ECF No. 76 at 26. She claims that this is a "'tactical' effort to stifle the truth and to prevent undersigned counsel who has introduced and presented corroborating expert analysis of the deficiencies in Dominion voting systems, and now has fulfilled her ethical duty to report the discovery of potential criminal violations to law enforcement." *Id.* Lambert asserts that Dominion seeks to disqualify her "because of her combined knowledge and the information she possesses from litigating cases in multiple jurisdictions," her "expertise and knowledge, including multiple expert analyses of the deficiencies in Dominion voting systems' product," and "to prevent her from using her expertise and knowledge to defend Mr. Byrne . . ." *Id.*[22] Lambert describes Dominion's motion as "puffery" and an "effort to downgrade" her with "*ad hominem* attacks." *Id.*; ECF No. 103 at 32:18–33:3.

---

[22]    Lambert cites to expert reports she purportedly obtained related to Dominion's voting machines, ECF Nos. 76-5; 76-6. It does not appear that these reports have anything to do with this Motion.

Lambert argues that neither she nor Byrne violated the Protective Order because the information was not covered by the Order. ECF No. 76 at 28. As explained above, this argument is meritless. Lambert asserts, alternatively, that any breach is justified under two "exceptions": (a) disclosure to law enforcement; and (b) the "*public interest* exception[,] which even the judiciary has a constitutional obligation to acknowledge." *Id.* at 28, 23 ("On this latter note, and equally, if not more, important, the information in the production contains information concerning criminal conduct and collusion and conspiracy with and by foreign nationals in the conducting of U.S. elections and therefore fall within an exception for matters of national security and constitutional important (sic), which have always enjoyed a robust 'tradition of accessibility' in this country.").

Lambert claims that Dominion's documents provide evidence of "some of the most serious crimes in national history and are a matter of national security." ECF No. 103 at 29:24–25. According to Lambert, this includes election fraud. ECF No. 76 at 30–32 (citing 52 U.S.C. § 10308, but no authority supporting its relevance or application here). She asserts that "foreign nationals are entering election systems in the United States before certification of the 2020 election," which "the public has a right to know" and "Dominion is complicit" in these events. *Id.* at 29. She further claims that "Dominion has filed this lawsuit . . . to hide these facts from the American public and to create a false narrative." *Id.*

Lambert cites no authority for these broad and significant assertions. Although she references cases that recognize the fundamental right to vote and articulate the general elements of alleged crimes, she cites no authority for the proposition that she was justified as a matter of law in taking the actions she did. ECF No. 103 at 40:17–22; ECF No. 76 at 25–45 (failing to offer any authority to support there is (a) an exception to protective orders for reporting what an attorney suspects is evidence of crime to law enforcement; b) an exception for disseminating what an

attorney believes is evidence of election interference, or another topic of grave national interest; or c) because attorneys have an obligation to report such evidence of alleged criminal wrongdoing, it would have been improper for her to first seek review in a "civil" court).[23]  Instead, Lambert vaguely claims that her oath to the Constitution as an attorney required her to take the actions she did.  ECF No. 130 at 36:5–13.  When pressed, Lambert's only answer to the Court for failing to cite any relevant authority was simply, and repeatedly, that the fact that her actions are justified is as obvious as the proposition that "water is wet."  ECF No. 103 at 40:7, 46:23, 59:15.  The Court addresses each of her arguments in turn.

### B.  Lambert's Disclosures Were Not Limited to Law Enforcement

As an initial point, Lambert's primary justification for her disclosures in violation of the Protective Order turns on she and Byrne having disclosed the documents to "law enforcement" akin to generally reporting evidence of a crime.  ECF No. 103 at 34:17–25.  Lambert cites no authority for this proposition or when such an exception may apply.  This argument is flatly rejected.

Even if Lambert had authority for this argument, it would still not justify her actions. Lambert and Byrne apparently did disclose the documents to some law enforcement officials— Sheriff Dar Leaf and an unnamed Assistant U.S. Attorney—the extent of their disclosures is much broader.  Lambert and Byrne have both publicly disseminated and discussed the documents to advance their theories about the 2020 election.  This includes Lambert submitting an affidavit from Leaf in her *pro se* filing in one of her own criminal cases in Michigan.  Both Lambert and Byrne

---

[23]    Lambert does not cite to any controlling authority in her discussion of the legal standard for disqualification.  ECF No. 76 at 25 (citing cases from the Eleventh, Fifth, Second, and Sixth Circuits).  Lambert repeatedly uses quotation marks or otherwise implies she is directly citing a source without actually citing a source.  *Id.* at 15, 20, 29.

A.48

have publicized Leaf's efforts to share the documents widely to non-law enforcement audiences.
Accordingly, her argument that she was duty-bound to disclose the documents to law enforcement
rings hollow in light of her subsequent actions.

### C.  Lambert Fails to Substantiate Her Arguments About Evidence of Crime

Lambert has failed to substantiate any of her conclusory allegations that Dominion's
Litigation Documents contain evidence of national security crimes.  She has not, for example,
pinpointed certain documents and made an argument that they meet the elements of any particular
crime.  Nor has Lambert explained why, when faced with these documents supposedly reflecting
serious crimes of national importance, she chose to disclose them to a single county sheriff in
Michigan as opposed to a national law enforcement agency such as the Federal Bureau of
Investigation or Department of Justice.  To the contrary, Lambert continues to advance these
allegations despite being unable to point to any court authority that substantiates them.

Lambert also argues that Dominion is engaging in "honest services fraud" in violation of
18 U.S.C. § 1846.  ECF No. 76 at 33.  Specifically, she argues that Dominion gets paid for
providing voting machines and systems for U.S. elections, but has colluded with foreign nationals
to give them access to these elections in "betrayal of public trust" and as part of "a deeper deception
that would appear to include honest services fraud."  *Id.* at 33.  Relatedly, Lambert claims
Dominion *may have* engaged in honest services wire fraud in violation of 18 U.S.C. §§ 1343 and
1346.  *Id.* at 34 (claiming without authority that Serbia conspired to interfere in elections in
Michigan and Pennsylvania).  Further, Lambert argues Dominion engaged in a conspiracy to
commit an offense against the United States or to defraud the United States, in violation of 18
U.S.C. § 371.  *Id.* at 35–36.  Per Lambert, Dominion did so by conspiring to impair "lawful
government functions," specifically the "regulat[ing] and monitor[ing]" of "participation of

foreign nationals in the American electoral process" and "impairing the requisite 'transparency in the American political process.'" *Id.* at 36 (alteration in original, but citing no source).[24]  Beyond her own speculation, Lambert does not substantiate these legal arguments in any way.  And in any event, she still fails to offer any legal support for the proposition that, notwithstanding her alleged discovery of criminal activity, she could unilaterally disregard and bypass the Protective Order.

### D.  Right to Vote Cases Do Not Provide Authority for Lambert's Position

Lambert proclaims that "[n]o constitutional right is more fundamental than the right to vote," but neglects to put forward any evidence for how *her* unilateral actions further that right. *Id.* at 40.  She discusses at length cases that recognize the fundamental right to vote, and there is no dispute that this right is fundamental.  *Id.* at 32–45.  But Lambert points to no authority for the proposition that these cases somehow authorize her to violate any court order just because *she* believes she has evidence of a vast criminal attempt to subvert this right.  *Id.*

Lambert's principal case, *Ex Parte Yarborough*, does not get her there.  Lambert asserts that *Ex Parte Yarborough* held that "[voting rights] are recognized and justiciable in any forum and in any matter in which they may be properly pled."  *Id.* at 32, 40 (citing *Ex parte Yarborough*, 110 U.S. 651, 661–63 (1884) ("[A]ny public inquiry into the deprivation of the fundamental right to vote is actionable, and the judiciary has an express obligation to abide because it has a duty to ensure that the Constitutional rights of American citizens to vote and to have their votes properly

---

[24]     Lambert makes various other arguments without citing any legal authority, including that: 1) the Court should consider Dominion as a state actor, without providing any authority for how Dominion would clear the high bar the Supreme Court has set for such analyses; 2) all Dominion communications should be subject to FOIA; and 3) Dominion CEO John Poulos committed perjury in his testimony before the Michigan Legislature on December 15, 2020.  ECF No. 76 at 37.  On the third point, Lambert claims that "[t]he fact that the voting systems and machines have the capacity to connect to the internet *and* the software was created and engineered by foreign nationals acting in concert with and for Dominion is sufficient in itself to lift the protective order and to allow disclosure of these email communications."  *Id.* at 38.

counted are secured.").[25]   *Yarborough* was a habeas action in which the Court recognized Congress's authority to enact criminal laws to punish voter interference, not a case where a private attorney in a civil lawsuit took unilateral action to "expose" confidential documents subject to a protective order.   *See Ex parte Yarborough*, 110 U.S. at 662.   Lambert's reliance on the case to support her conduct is unreasonable and borders on frivolous.

Lambert's other right to vote cases are similarly irrelevant to the questions before this Court.   In *Reynolds v. Sims*, the Supreme Court struck down voting districts in Alabama for violating the Equal Protection Clause of the Fourteenth Amendment by not apportioning districts on a population basis.   377 U.S. 533, 583–87 (1964).   In *Yick Wo v. Hopkins*, the Supreme Court recognized that, although it is not enumerated as an express grant in the Constitution, the right to vote is fundamental because it is "preservative of all rights."   118 U.S. 356, 370 (1886).   The Supreme Court has repeatedly affirmed this holding.   *See e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966).   Again, nothing in these cases excuses Lambert's actions.

Finally, even if Lambert had a valid reason to disclose Dominion's Litigation Documents, she still has offered no viable, let alone meritorious, argument to justify all of her other misconduct. Her purported justifications do not excuse her other violations of the Protective Order, including the fact that she: a) did not notify Dominion of her intent to disclose the documents; b) did not seek Court approval to disclose the documents; c) refused to provide an accounting of the extent of her breach when Dominion requested it; and d) threatened Byrne's document database

---

[25]   In *Yarborough*, seven members of the Ku Klux Klan attacked a Black man to prevent him from exercising his recently-recognized right to vote.   110 U.S. at 657–67.   The KKK members were convicted of violating federal laws protecting the right to vote, and they subsequently filed habeas petitions challenging their convictions.   *See id.*   The Supreme Court rejected the petitioners' arguments, holding that Congress properly acted within its authority to pass criminal penalties for certain conduct interfering with the right to vote.   *See id.*

A.51

management company with criminal penalties if they impeded her access to the documents.  Nor do they address her subsequent misconduct and violations of court orders, despite her repeated assurances to the Court that she understood her obligations and would comply with the Court's orders.

## IV.   <u>Disqualification</u>

Because the Court concludes that the Protective Order governed the documents, Lambert repeatedly violated that and other court orders, and that there is no justification for her actions, the Court now considers whether to disqualify Lambert.

### A.  Legal Standard

A district court has "wide discretion in the exercise of its duty to supervise members of the bar appearing before it." *Koller*, 737 F. 2d at 1054 (citing *Groper v. Taff*, 717 F.2d 1415, 1418 (D.C. Cir. 1983)); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991) (discussing the court's longstanding inherent authority to sanction misconduct before it); *United States v. Philip Morris Inc.*, 347 F.3d 951, 955 (D.C. Cir. 2003).  "Motions to disqualify are governed by two sources of authority.  First . . . the local rules of the court in which they appear . . . Second, because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying the standards developed under federal law." *Paul v. Judicial Watch, Inc.*, 571 F. Supp. 2d 17, 20 (D.D.C. 2008) (internal quotation marks omitted) (citing case law from the Tenth, Fifth, and Eleventh Circuits).

The D.C. Circuit has held that disqualification should be granted rarely absent circumstances in which an attorney's prior representation compromises her ability to zealously represent a current client. *See Koller*, 737 F.2d at 1056.  As the Circuit has held, "*[e]xcept in cases of truly egregious misconduct likely to infect future proceedings*, other means less prejudicial to

49

the client's interest than disqualifying the counsel of [his] choice are ordinarily available to deal with ethical improprieties by counsel."  *Id.* (emphasis added).  In so stating, the D.C. Circuit cited with approval language in a Second Circuit decision:

> Indeed, we see much wisdom in the view expressed by Judge Mansfield in concurrence:
>
> 'The attorney is the client's choice. Disqualification is wasteful and time-consuming. Only where the attorney's unprofessional conduct may affect the outcome of the case is there any necessity to nip it in the bud. Otherwise conventional disciplinary machinery should be used and, if this is inadequate, the organized bar must assume the burden of making it effective as a deterrent.'

*Id.* (citing *Board of Education of New York City v. Nyquist*, 590 F.2d 1241, 1247–48 (2d Cir.1979) (internal quotations omitted).

Although it is rare, the D.C. Circuit has not "*prohibit[ed]* disqualification outside of the two enumerated circumstances."  *Paul*, 571 F. Supp. 2d at 24 (emphasis in original); *see also Koller*, 737 F.2d at 1064 (holding that "questionable activities . . . [that] *do not* clearly violate a disciplinary rule and taint future proceedings" should be remedied by means other than disqualification) (emphasis added).

## B. Disqualification is Warranted

Dominion acknowledges that disqualification is an extraordinary remedy.  ECF No. 75 at 21.  Dominion argues, however, that disqualification is necessary here because "lesser sanctions will not protect the integrity of this litigation."  *Id.*  In support, Dominion cites to Lambert's "well-documented historical efforts to obtain and misuse Dominion confidential information, her pattern of disregard for judicial rules, and her willful and ongoing violation of the Protective Order in this case."  *Id.*  Dominion asserts that Lambert's "truly egregious misconduct . . . has already and will continue to infect this, and frankly, all of Dominion's other proceedings."  ECF No. 103 at 5:19–21.  According to Dominion, although Lambert's conduct clearly meets the requirements for a

contempt citation—violating a "definite and specific court order" of which the party is aware—contempt is insufficient because Lambert has repeatedly shown she will violate court orders without regard for the consequences.  ECF No. 75 at 21–22 (citing *Pigford*, 307 F. Supp. 2d at 55–56).   Additionally, Dominion argues that it cannot entrust Lambert with highly sensitive and confidential information that impacts "its business, and the safety of its own employees and our nation's election workers."  *Id.*  Lambert, on the other hand, has no meaningful response as to what would be appropriate if the Court finds sanctions are warranted.  ECF Nos. 76; 97; 106; 111; 117.[26]

There is no question that disqualification is a rare sanction.  *See Koller*, 737 F.2d at 1056.  This, however, is one of those rare cases where the circumstances of Lambert's misconduct are "truly egregious" such that her continued involvement would "infect future proceedings."  *Id.*  The Court agrees with Dominion that no lesser sanction will suffice.  There are at least five reasons that illustrate why Lambert's conduct meets the high bar for disqualification: 1) Lambert's breach of the Protective Order was intentional, had significant consequences, and was without justification; 2) Lambert has since repeatedly violated court orders and made misrepresentations to the Court; 3) Lambert's prior conduct and admonishment undermines her argument that she acted in good faith and reflects her disregard for the Court's orders and rules; 4) Lambert has not refuted Dominion's argument that if the Court should impose a sanction, disqualification is the most appropriate; and 5) Lambert's conduct has already severely tainted this proceeding and will continue to do so if she remains counsel in this case.

---

[26]    Byrne's first sur-reply raises a new procedural argument that Dominion improperly combined a motion for protective relief and disqualification in a single filing.  ECF No. 97.  Byrne has no excuse for waiting to raise this until six weeks after Dominion filed its Motion, and not in his first response.  Byrne also alleges that Dominion improperly raised certain additional issues *ex parte*, such as the continued impact of Byrne and Lambert's breaches, without Byrne having an opportunity to respond.  *Id.*  As detailed herein and on the docket for this case, Byrne and Lambert have had ample opportunities to respond to Dominion's assertions.

A.54

### 1.   Nature and Severity of Lambert's Initial Misconduct

The record is clear that Lambert's initial breach of the Protective Order—disclosing anywhere between thousands and nearly three million of Dominion's Litigation Documents before she even entered her appearance in this case—was massive and intentional.  ECF No. 96 at 3 (describing how many documents Dominion has produced in discovery).  Most, if not all, of the documents were stamped "Confidential."  ECF No. 82 at 20.  Lambert was only allowed to access the documents after she signed the Undertaking confirming that she would comply with all provisions of the Protective Order.  ECF No. 75-9.  Yet she blatantly disregarded this Order and her guarantee that she would comply with it.  This is not a case of an inadvertent breach or good faith disclosure; it is unfathomable for Lambert to believe she could do whatever she wanted with Dominion's Litigation Documents.  Lambert's actions were intentional and clearly meant to inflict the harm that has resulted.  Moreover, there is no dispute that the dissemination of the documents has led to individuals, including Dominion's CEO and employees, facing severe threats.

The Court also notes that this is not a case in which Lambert's conduct could be excused on the grounds that she was engaging in zealous representation of her client within the bounds of the rules and orders governing attorneys in this Court.  If anything, it appears she was zealously pursuing her client's goals (and clearly her own goals as well), *outside* those boundaries.

### 2.   Lambert's Repeated and Remorseless Misconduct

Even if Lambert's initial actions could be excused in some way, her repeated violations of numerous provisions of the Protective and Status Quo Orders since then demonstrate that the Court cannot trust her to follow orders if she were permitted to remain in this case.  Lambert's actions are particularly concerning given her representations—both orally and in writing—that she understood her obligations and would abide by them.  The Court has no reason to believe Lambert

when she promises she will comply with the Court's Orders in the future, having already broken this promise repeatedly. *See, e.g.*, ECF No. 103 at 44:18–19 ("I will follow all specific orders that the Court gives."), 45:14–23. Not only does Lambert maintain that she did nothing wrong and that her actions were necessary, she clearly believes that following the Court's Orders and procedures will result in greater harm than proceeding according to her own view of the world:

> If I were to go to the counsel for the criminals and let them know that I believe there is evidence of a crime that I want to report to the police, that could result in a destruction of evidence, criminal actors fleeing, hiding.

*Id.* at 59:15–18. Lambert has even implied that this Court is obstructing her ability to comply with the law, remarking that "[i]f the Court were to rule that I was not able to report criminal acts with ongoing investigations already in place with Congress, law enforcement, prosecutors' offices, *that would be obstruction*." *Id.* at 39:22–40:1 (emphasis added). Even after being repeatedly warned and promising she would comply with Court orders or seek Court guidance if she had any confusion, Lambert continues to openly disregard court orders. At the May Hearing, Lambert even began to discuss the contents of Dominion's documents that she alleges evidence crime until the Court abruptly stopped her because the courtroom had not been sealed. *Id.* at 37:21–38:13. As noted, after the May Hearing, Lambert continued to make baseless claims about the scope of the Protective Order and allow herself and Byrne to violate the Order repeatedly. ECF No. 106.

This Court has recognized that a "clear violation of . . . the District of Columbia Rules of Professional Conduct" can merit disqualification. *Paul*, 571 F. Supp. 2d at 27.[27] Moreover, this

---

[27]     In *Paul*, this Court acknowledged that the D.C. Circuit had not determined whether violation of an ethical rule itself would be sufficient for disqualification, or if the conduct must also somehow "taint" the underlying trial. *Paul*, 571 F. Supp. 2d at 26–27. This question did not impact the Court's outcome in that case because the rule that the attorney violated, Rule 1.9, "creates an irrebuttable presumption that its violation will taint the underlying trial." *Id.* at 26. Here, there is ample evidence that Lambert has violated her ethical obligations *and* that her continued involvement would taint the proceedings moving forward.

Court views intentional violations of its orders as severe misconduct. *Münchener*, 312 F.R.D. at

686–89 (discussing an attorney's egregious misconduct including "knowingly violat[ing] the

obligations imposed" in a protective order); *Stone v. U.S. Embassy Tokyo*, Case No. 19-cv-3273,

2021 WL 1110735, at *1–4 (D.D.C. Mar. 23, 2021) (describing how a *pro se* litigant's conduct in

intentionally and publicly disclosing provisions of a protected government document and

indicating he would not comply with court orders was severe enough to warrant dismissal as a

sanction if the case were not already dismissed); *Young v. Office of U.S. Senate Sergeant at Arms*,

217 F.R.D. 61, 70 (D.D.C. 2003) (concluding that a plaintiff's repeated misconduct in discovery made

it "extremely unlikely" that the plaintiff would obey a protective order going forward).  Lambert

clearly views compliance with Court Orders with which she does not agree as optional, which is

incompatible with our judicial system.  Allowing Lambert to continue as Byrne's counsel when

she has already demonstrated a willingness, if not determination, to do whatever it takes to advance

her theories infects this proceeding and jeopardizes this Court's ability to depend on counsel and

parties adhering to their rules, obligations, and the law.

### 3.   Prior Conduct and Admonishment

Lambert's conduct in her brief time representing Byrne in this litigation is sufficient by

itself to warrant the sanction of disqualification.  That said, in considering sanctions in other

contexts (i.e., Rule 11), this Court has held that it may consider prior instances of misconduct

outside of the case before it.  *See Atkins v. Fischer*, 232 F.R.D. 116, 121–22, 129–30 (D.D.C. 2005)

(internal citations omitted) ("It has long been held that in considering the implementation of

sanctions against a party or a counsel to a litigation, a district court may consider all the

circumstances surrounding the alleged violation.  The totality of the circumstances can include

events which did not occur in the case proper but occurred in other cases and are, by their nature,

relevant to the pending controversy.").

Although this Court has not answered the same question with respect to questions of disqualification, Lambert herself has referenced her conduct in other proceedings as being relevant to resolving Dominion's Motion.  ECF Nos. 76 at 9–10, 24 (arguing that Dominion is engaged in a conspiracy to prevent Lambert from being involved in such cases with others including the Michigan Attorney General); 103 at 32:24–33:3 (claiming that she has "won" every time Dominion and others attack her), 41:19–42:12 (claiming that Dominion is only seeking to disqualify her because of her work on election cases).  Despite Lambert's claim that she has "won" every time she encountered any sort of grievance or discipline, the Pennsylvania and Georgia courts' opinions paint a concerning picture of her conduct in those cases nonetheless.  ECF No. 103 at 32:24–33:3; *Cnty. of Fulton*, 292 A.3d at 1018–19; *Curling*, 2023 WL 7463462, at *23– 24.  Both her prior admonishment and conduct in this case cast doubt on Lambert's claim that she "did everything in good faith" and is committed to following Court orders going forward.  ECF No. 103 at 46:1–2.

### 4.  Lambert's Concessions

"It is well understood in this Circuit that when a [Party] files an opposition to a dispositive motion and addresses only certain arguments raised by the [other Party], a court may treat those arguments that the [Party] failed to address as conceded."  *Hopkins v. Women's Div., General Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd* 98 Fed. Appx. 8 (D.C. Cir. 2004).  Dominion has put forth a compelling case for why the Court should disqualify Lambert and why lesser sanctions are insufficient.  ECF No. 75.  Lambert did not address Dominion's arguments about the insufficiency of any lesser sanction beyond disqualification, and she has not otherwise asked the Court to consider any lesser sanction.  *Cf.* ECF No. 76.

In fact, Lambert herself has acknowledged that disqualification might be an appropriate sanction. At the May Hearing, while Lambert was assuring the Court that she would come to it first in the future with any questions about the scope of the Court's orders, she noted that if the Court did not disqualify her based on her conduct to date, it could always do so in the future. ECF No. 103 at 49:2–15, 59:20–24 (". . . but the Court needs to understand my mindset was in good faith, and the Court does have the ability to issue sanctions or remove me from the case should I do anything inconsistent moving forward with a Court order."). As set forth above, Lambert continues to violate the Court's Orders to this day and her actions undermine her claim that she has done everything in good faith.

### 5. Lambert's Egregious Misconduct Has and Will Infect These Proceedings

Finally, as discussed extensively in this Memorandum and summarized below, Lambert's conduct has already substantially infected and will continue to infect these proceedings. In her short time as counsel in this case, Lambert has caused exponential harm that cannot be undone. The Court's only meaningful option to mitigate the specific risk of future harm Lambert poses is by removing her from this case.

First, Lambert's conduct has significantly hampered discovery in at least Byrne's specific case, if not also the coordinated/consolidated cases. ECF No. 81 at 5 ("Defendant needs additional time to comply with the discovery scheduling due to the fact that he and undersigned are effectively unable to prepare for depositions and further preparation in light of the Court's current order (Docket No. 77), prohibiting any access to discovery materials and documents produced by Dominion (Dominion Discovery Materials)."). It is remarkable how issues relating to Lambert's misconduct completely subsumed what were supposed to be the final two months of discovery. ECF No. 60 (setting a discovery deadline of May 30, 2024); 06/13/2024 Minute Order (updating

the discovery deadline to September 30, 2024).  Lambert did not enter her appearance as Byrne's counsel until March 12, 2024.  ECF No. 71.  Five days later, this Court entered the Status Quo Order that prevented Lambert and Byrne from accessing Dominion's discovery.  ECF No. 77.  Since then, Byrne has reportedly been at an "insurmountable disadvantage for the preparation of depositions and further litigation concerning Dominion's claims."  ECF No. 81 at 6.

Dominion's counsel has represented that Lambert's continued role in this case has also impacted their ability to zealously represent their client.  ECF No. 103 at 20:3–10.  Dominion's counsel reports that for "every document [they] produce" and "every person [they] put up for deposition," they have "no good faith reason to believe that the . . . attorney on the other side is going to follow the Court's orders."  *Id.*  As for the Court, Lambert's conduct has prevented it from considering other discovery issues in the consolidated or coordinated cases, as it has had to first address Lambert and Byrne's continuing violations of the Court's Orders.  The Court has now held two multi-hour hearings and reviewed over 2,500 pages of briefs and exhibits related to the violations of the Protective and Status Quo Orders and Lambert's other misconduct.  *See* ECF Nos. 75; 76; 78; 81; 82; 84; 85; 90; 92; 93; 94; 95; 96; 97; 98; 99; 100; 101; 102; 103; 105; 106; 108; 110; 111; 112; 113; 114; 116; 117.[28]

Second, Lambert refuses to take any responsibility for her client repeatedly violating court orders.  For example, the Court does not know the contents of a video Byrne posted to a social media platform on April 3, 2024 because Lambert directed Byrne to take down the video and did preserve a copy pursuant to the Status Quo Order and her obligations as his counsel.  ECF No. 103

---

[28]     This list is nowhere near exhaustive.  For example, the Court does not include ECF No. 86 or ECF No. 87, which are prior motions that Lambert, on behalf of Byrne, erroneously filed and the Court rejected for failing to comply withs the Local and Federal Rules.  Nor does it include other docket entries that the Court considered in the *Lindell* litigation.  *See e.g.*, ECF Nos. 145; 147; 149; 152; 153; 154; 155; 156 in Case No. 21-cv-445.

A.60

at 47:2–48:10.  Lambert stated that she only saw part of the video, so she could not answer questions about whether Byrne discussed Dominion's documents in the video.  *Id.*  She represented that, from the portions she did see, Byrne "was addressing that he wanted to comply with what the Court is ordering and that he believed that we hadn't done anything wrong."  *Id.*  It is difficult to fathom how, if that was the extent of Byrne's video, Lambert would feel the need to advise her client to remove it from public view and fail to keep a copy.  When asked about other social media posts, Lambert remarked:

> [M]y client posts frequently about many, many topics.  I do not have time, nor do I want to bill him for babysitting his social media.

*Id.* at 48:6–10.  Indeed, the day after the May Hearing at which Byrne expressly affirmed that he understood and would comply with the requirements in the Protective and Status Quo Orders, he again violated these orders by sharing social media posts that included Dominion's Litigation Documents.  *Id.* at 61:23–25 ("THE COURT: And are you prepared to comply with [the Orders], sir?  MR. BYRNE: Yes."); ECF No. 105.

Byrne has made clear he has no intention of following this Court's orders and Lambert has made clear she does not feel responsible for ensuring he does so.  On April 2, 2024, the day before he posted the video that he later deleted, Byrne said the following in another video on X:

> It's absolutely incorrect, Judge, to tell us we have to honor that agreement to keep these crimes secret.  And I'm telling you here, and Judge, with all due respect, you decide what you want.  *We're giving you the honor this time of going through the steps that Stefanie evidently was supposed to do last time.  But there's no chance in hell I'm not going to make this public.*
>
> This is crazy, what we have.  We got to go through all this Kibuki dance.  But we are giving him the respect this time of allowing him the opportunity to unseal this.  *But I'm affirmatively saying, I don't care.  I have it now.  I have it on my machine.* I'm not in the country.  This stuff doesn't get unsealed, *I'm just going to make it public.*  You can throw me in jail.  Because we know we're right, and you're covering up if you don't let this – the whole nation hinges on this.  You obviously have a duty, Your Honor, to unseal this Dominion case.  And *I'm going to do it*

A.61

> *anyway if you make the wrong decision and you throw me in prison*.  And I mean that.

ECF No. 102-3 at 11 (emphasis added).  Byrne added:

> *I'm going to make this stuff public*.  So I hope you make the right decision, but I'm not going to keep this quiet.  I'm going to give you time to make the right decision.  And if you make the wrong decision, I'm just going to do the right thing anyway and you throw me in jail.  Fuck you . . . I shouldn't say fuck you to a judge . . . but I'm saying fuck you to the judicial system.

*Id.* (emphasis added).  Lambert's refusal to ensure her client's compliance with the Court's Orders will no doubt continue to disrupt these proceedings.

Third, permitting Lambert to remain Byrne's counsel would both minimize the severe consequences of their actions and risk continued harm.  Byrne—with Lambert's support—has made expressly clear that he plans to follow through on his promise to do whatever it takes, including risking jail time, to disseminate Dominion's Litigation Documents.  *Id.*; ECF Nos. 105; 106.  Byrne and Lambert's acts have not only fueled theories of widescale election fraud and crime—which Dominion describes as xenophobic for being purely based on Dominion's employment of Serbians—they have resulted in real harm and threats to Dominion employees.  ECF Nos. 75; 82; 108; 113.  Byrne and Lambert were on notice that their actions could result in harm, as that is part of Dominion's underlying suit against Byrne.  It was abundantly foreseeable that similar statements to those at issue in the Complaint could lead to similar results.

Finally, the reasoning behind the D.C. Circuit's high bar for disqualification due to egregious misconduct would lead to an untenable result if Lambert were permitted to remain counsel here.  The main justification for limiting disqualification to extreme circumstances (absent conflicts of interest) is our system's recognition of the importance of litigants being able to choose their counsel.  This principle cannot mean that courts must protect such a choice that is based on the counsel's willingness to engage in such egregious misconduct or to facilitate their client's

similarly extreme and egregious misconduct.  *See* ECF No. 75-3 ("My client insisted the evidence of criminal acts be provided to law enforcement.").[29]

Dominion has raised a plausible narrative that Lambert became involved in this litigation so that she could gain access to Dominion's documents and use them for improper purposes.  ECF No. 75 at 3, 21–22.  After thoroughly reviewing Lambert's conduct, responses, and representations to this Court, the Court does not disagree.  It is undisputed that Lambert entered the case without giving notice for months, gained access to Dominion's documents, shared the documents with Leaf and used them in her own criminal case while hiding these actions from even McGlinchey, all before she entered her formal appearance.  Lambert has failed at every opportunity to show the Court that she will act in accordance with its rules and requirements.

Lambert's conduct in the past few weeks continues to exacerbate this concern.  At best, Lambert failed to inform the Court and Dominion that Case, another attorney, had access to Dominion's Litigation Documents and, at some point, became involved in this litigation.  ECF No. 113.  This failure is severe, as the Court clearly and repeatedly prohibited Lambert from sharing Dominion's Litigation Documents with anyone else, and at the very least required her to inform the Court if anyone else gained access to the documents.  But even more troubling, Dominion has put forth another plausible narrative that Lambert and Case have orchestrated a series of new moves to disseminate Dominion's Litigation Documents and other discovery publicly in contravention of this Court's orders.  ECF Nos. 108; 113.  According to Dominion, Lambert has clearly enabled Case to access Dominion's Litigation Documents and Case seeks to use the documents outside this litigation.  ECF Nos. 113 at 3–7; 113-4 at 3.  But even more concerningly,

---

[29]     *See also In re BellSouth Corp.*, 334 F.3d 941, 946–47 (11th Cir. 2003) (rejecting a mandamus petition to review a disqualification ruling as not immediately appealable when a court disqualified counsel for "act[ing] with the purpose of forcing [a judge] to disqualify" himself).

Lambert and Case now seek to publicly release Poulos' deposition—which is not yet, as far as the Court is aware, publicly available. ECF Nos. 108 at 2–10; 113 at 3–7; 116 at 25. Dominion's well-founded concern about Lambert's continued involvement in this litigation was that she would find other ways to circumvent Court orders. It now appears that is exactly what she has done. Lambert has no response to this theory. ECF Nos. 111, 117.

Despite that no party, particularly Lambert, has made any meaningful argument in favor of lesser sanctions, the Court has considered whether there is an available sanction less severe than disqualification that could mitigate the harm Lambert has and continues to inflict on the judicial process. As set forth above, however, no order, rule, warning or prohibition has stopped her misconduct in this case. For example, after the period of time following the Status Quo Order, she could have complied strictly with both Orders and given the Court *some* faith that she would cease her misconduct. Instead, she continued to violate the Orders, put forth baseless arguments to excuse Byrne's continued flagrant misconduct, and create fire drills for Dominion and the Court by refusing to be forthright with the Court.

The bottom line is that, in her short time as counsel, Lambert has repeatedly shown that she has no regard for orders or her obligations as an attorney before this Court. *See e.g.*, ECF Nos. 103 at 40:6–14 ("I have an obligation to report criminal acts that I reviewed in this discovery that are black and white and clear. I can see fraud of services in these documents. I can see conspiracy in these documents."); 106. Lambert's blatant disregard for this Court and her obligations is unending; her actions have already severely infected this proceeding. There is no doubt that they would continue to do so if she were permitted to remain counsel in this case.[30] This Court cannot

---

[30]   As noted, in the past two weeks Dominion sought leave to file two additional supplements detailing even more incidents of alleged misconduct by Lambert, highly concerning remarks from Byrne, and efforts to use Dominion's Litigation Documents in the Peters Criminal Case. ECF

allow such intentional, dangerous, and relentless misconduct to continue.  Lambert is immediately disqualified from serving as counsel in this case.

### CONCLUSION

For the foregoing reasons, Dominion's Motion is **GRANTED**.

Date: August 13, 2024

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

---

Nos. 118; 122.  The Court appreciates efforts to supplement as the Court previously requested, but it resolves this Motion without addressing these latest incidents because it appears that any other approach will only continue the cycle of alleged misconduct while this Motion is pending.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., *et al.*,

      *Plaintiffs*,

  v.

PATRICK BYRNE,

      *Defendant*.

Civil Action No. 1:21-cv-02131 (CJN)

## <u>ORDER</u>

On June 8, 2023, the parties jointly moved for an order to govern the handling of information shared through discovery. *See* ECF 45. The Court thereafter entered a Protective Order expressly mandating (among other things) that:

> *Any Discovery Material produced in the Litigation will be used ... solely for purposes of this Litigation and no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery material public except as permitted by this Order and in this Litigation.*

ECF 46 at 3 (emphasis added). The Protective Order also requires that, if a party receives a subpoena to produce certain discovery material, it must inform the other party and object to producing the material.[1] *Id.* at 18–19.

On March 12, 2024, attorney Stefanie Lambert entered her appearance on behalf of Defendant Patrick Byrne. Three days later, Plaintiffs moved to disqualify Lambert, accusing her of violating the Court's Protective Order by (1) publicly filing, in a Michigan criminal case against

---

[1] This requirement applies to subpoenas seeking material that the producing party has designated as confidential or "attorneys' eyes only." The Protective Order creates avenues for challenging such a designation. *See id.* at 3–4, 13–14.

her, documents that were produced here pursuant to that Order; and (2) providing to a Michigan sheriff her username and password so that he could access the discovery database (which included documents produced pursuant to the Order). *See* ECF 75 at 9. Lambert did not deny that she disclosed the documents, that the Michigan sheriff accessed the database, or that the materials were thereafter viewed thousands of times, but she asserted that the documents were not protected by the Order and that, even if they were, she was entitled to give them to law enforcement. *See* ECF 76 at 28.

Magistrate Judge Upadhyaya thereafter entered a so-called Status Quo Order, which was intended both to cure (to the extent possible) the dissemination of materials subject to the Court's Protective Order and to prevent further violations during the pendency of Plaintiffs' motion.[2] *See generally* ECF 77. Five months later, Judge Upadhyaya disqualified Lambert, holding in a lengthy and thoughtful opinion that Lambert violated both the Protective Order and the Status Quo Order and that no lesser sanction was appropriate. *See* ECF 126. Lambert challenges that decision.

## Analysis

Putting aside a few exceptions not relevant here, disqualification is appropriate only "in cases of truly egregious misconduct likely to infect future proceedings." *Koller ex rel. Koller v. Richardson-Merrell Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds*, *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985). The parties dispute what standard of review applies to Judge Upadhyaya's decision that disqualification was appropriate here. But the Court need not resolve that dispute, since it would affirm that decision even if it were reviewing the disqualification *de novo*.

---

[2] The Court referred all discovery disputes in this case to Judge Upadhyaya. *See* Minute Order, January 31, 2024. The Court also referred to her the motion to disqualify Lambert. *See* Minute Order, April 15, 2024.

To begin, Judge Upadhyaya correctly decided that Lambert violated the Protective Order. That Order expressly provides that discovery material can be used "solely for purposes of this Litigation," that it will not be given "to any person or entity (including for any other litigation)," and that it will not be made "public except as permitted by this Order and in this Litigation." Lambert, however, gave a sheriff unrestricted access to the entire discovery database.  And even if, as Lambert argues, an implied exception to the Protective Order allowed her to disclose the materials to law enforcement officers (it did not), that exception would not excuse her having filed the documents on a public docket.  To the extent Lambert believed the public had a right to access the discovery materials, she was required to seek approval from the Court for that disclosure. Instead, after agreeing to use discovery material only as permitted by the Protective Order, *see* ECF 75-9, she unilaterally decided to disseminate it publicly.

It's possible that disqualification would not have been warranted had things stopped there; a lesser sanction might have sufficed if, for example, Lambert demonstrated that she had made a genuine mistake about the Protective Order and that she would comply with it in the future.  But Judge Upadhyaya did not disqualify Lambert solely for her initial acts.  Instead, Judge Upadhyaya entered the Status Quo Order and gave Lambert five months to show that she would not continue to jeopardize the confidentiality of discovery materials.  *See* Tr. 5/16/2024 at 60:24-61:2 ("I want to make it very clear that going forward if I see any evidence that violates this [status quo] order, I'm going to take that into account in my final resolution [of Plaintiffs' motion].").  Lambert failed to do so.

It is true that Lambert's misconduct during the status quo period was not as egregious as her initial violations, at least insofar as she did not leak any new documents.  But during that period, the bar for compliance had become higher; for good reason, the Status Quo Order imposed

additional obligations.  For example, that Order required that Lambert "undertake every reasonable effort to remove" the filings in the Michigan docket "from the public record and file them under seal instead."  ECF 77 at 2.  Lambert claims that she raised the issue with her counsel in that case; but when her counsel refused to file the documents under seal, Lambert apparently stopped attempting to comply with the requirement and did not inform Judge Upadhyaya of her unsuccessful attempt.  *See* ECF 126 at 37–38; Tr. 5/16/2024 at 29–31.  That half-hearted effort falls far short of taking "every reasonable effort" to remove the documents from the public record and file them under seal.

The Status Quo Order also required that Lambert "immediately desist from sharing, distributing, providing access to or discussing any discovery material."  ECF 77 at 1.  However, the day after the hearing at which Judge Upadhyaya issued that Order, Lambert stated to ABC News that "[t]he Dominion file contained evidence of perjury … Honest Service Fraud, Wire fraud, etc."  ECF 126 at 15 (emphasis omitted).  And just a few weeks later, Lambert again discussed the discovery material during an interview.  *See* ECF 102-1 at 23 ("I was immediately able to spot a number of different criminal pieces of evidence—a lot, ok? Not just one document or two.").[3]

During this later period, Lambert also ignored (if not violated) at least two parts of the original Protective Order.  First, that Order obligates Lambert to "make reasonable efforts to prevent disclosure of … Discovery Material by each unauthorized person who receive[d] the information" she leaked.  ECF 46 at 20.  When Lambert appeared on a podcast and the host began discussing the leaked documents, Lambert did not attempt to stop him.  Instead, she encouraged

---

[3] For convenience, the Court cites to Plaintiffs' transcripts of Lambert's interviews.  The Court has watched the interviews and verified that the transcripts are accurate.

the host to invite onto the show the sheriff to whom she had provided access to the discovery database.  ECF 102-1 at 22.  Second, the Protective Order obligates any party who "receives a subpoena or other compulsory process seeking the production" of confidential discovery material to "object to the production of" that material "on the grounds of the existence of this Order."  ECF 46 at 18–19.  When Lambert informed Plaintiffs that she had received a subpoena to produce confidential material, she indicated that it was Plaintiffs' burden to object.  *See* ECF 108-9 at 6. After Plaintiffs pointed her to the Protective Order's clear language to the contrary, Lambert repeatedly failed to confirm that she would object to the subpoena.  *See* ECF 108 at 3–4; *see generally* ECF 108-9.

In short, after it became clear that Lambert had engaged in egregious violations of the Protective Order, she should have taken every step possible to show that those would remain isolated incidents.  Instead, she violated the Status Quo Order and, at best, skirted around the edges of the Protective Order.  That conduct—combined with Lambert's view, expressed both before Judge Upadhyaya and now before this Court during the October 17, 2024 hearing, that she was entitled to leak discovery materials because she believed doing so to be in the public interest— creates a real and continuing risk that Lambert might again leak confidential information.  Judge Upadhyaya thus correctly concluded that Lambert's continued violations were "likely to infect future proceedings," *Koller*, 737 F.3d at 1056, and that no sanction short of disqualification would suffice.

Accordingly, it is **ORDERED** that Defendant's Motion for Order, ECF 133, is **DENIED**.


DATE:  October 22, 2024

CARL J. NICHOLS
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., *et al.*,

         *Plaintiffs*,

    v.

PATRICK BYRNE,

         *Defendant*.

Civil Action No. 1:21-cv-02131 (CJN)

## ORDER

Magistrate Judge Upadhyaya disqualified Defendant's counsel, Stefanie Lambert, due to Lambert's repeated violations of various orders. *See* ECF 126. Lambert objected, ECF 133, and in October, this Court upheld the disqualification, *see* ECF 144. Lambert moves for relief from the October order.[1] *See* ECF 148. None of her arguments persuade the Court.

First, Lambert points out that there is generally a presumption against disqualification. ECF 148-1 at 8–9. The Court agrees, but the October order correctly applied that presumption, finding that disqualification was warranted only because this is the rare case involving "truly egregious misconduct likely to infect future proceedings." *See* ECF 144 at 5 (quoting *Koller ex rel. Koller v. Richardson-Merrell Inc.*, 737 F.2d 1038, 1056 (D.C. Cir. 1984), *vacated on other grounds, Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424 (1985)).

Second, Lambert argues that the Court erred by finding that she violated the protective order during several interviews by disseminating leaked material. ECF 148-1 at 9–10. But the

---

[1] Lambert filed her motion "[p]ursuant to Rule 60(b) of the Federal Rules of Civil Procedure," ECF 148 at 1, but that rule applies only to final orders. The Court will construe her motion as one for reconsideration of an interlocutory order under Federal Rule of Civil Procedure 54(b).

Court made no such finding.  Rather, the October order stated that Lambert violated *the status quo order* during the interviews.  That order, entered by Judge Upadhyaya following Lambert's initial violations of the Court's protective order, required Lambert to "immediately desist from … discussing any discovery material."  ECF 77 at 1.  As the October order points out, Lambert violated the status quo order during her interviews by discussing the materials she had previously disseminated.  *See* ECF 144 at 4.[2]

Third, Lambert asserts that she has discovered exculpatory evidence in the criminal case against her.  But the substance of that case had, and continues to have, no impact on the Court's decision that disqualification was warranted.  The October order discussed the criminal case only as one avenue through which Lambert violated the protective order—specifically, by uploading Dominion's discovery materials to the docket and thus giving the public at large access to them.

Finally, Lambert states that a party can be relieved from an order if the party was unable to present a claim or defense.  However, none of the issues Lambert alleges, *see* ECF 148-1 at 19–22, relate to whether she had an opportunity to challenge Judge Upadhyaya's disqualification order.  Lambert had such an opportunity, and she took it; as part of her objection to the order, she participated in oral arguments and submitted lengthy briefing, *see* ECF 133–34 & 139.  The Court's rejection of Lambert's arguments does not mean that she was unable to present them.

Accordingly, it is **ORDERED** that Defendant's Motion for Order, ECF 148, is **DENIED**.


DATE:  December 13, 2024

CARL J. NICHOLS
United States District Judge

---

[2] As for Lambert's accusation that the Court relied "on Dominion's bare assertions" about Lambert's interviews, ECF 148-1 at 10, the Court reiterates—as it stated in the October order, *see* ECF 144 at 4—that the Court based its conclusions on its own viewing of the interviews.

## <u>CERTIFICATE OF PARTIES AND AMICI</u>

Patrick Byrne is the Defendant/Appellant. US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation are the Plaintiffs/Appellees.  There are no other parties and no amici.

*/s/Laranda M. Walker*
Laranda M. Walker

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and Circuit Rule 26.1 of the United States Court of Appeals for the District of Columbia Circuit, US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively "Dominion") hereby file this Disclosure Statement.

US Dominion, Inc. is a for-profit Delaware Corporation with its principal place of business in Denver, Colorado.

Dominion Voting Systems, Inc., which is a wholly owned subsidiary of US Dominion, Inc., is a for-profit Delaware corporation with its principal place of business in Denver, Colorado.

Dominion Voting Systems Corporation, also a wholly owned subsidiary of US Dominion, Inc., is a for-profit Ontario corporation with its principal place of business in Toronto, Ontario.

Dominion contracts with state and local governments to provide voting systems and related services.

The following are parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock of US Dominion, Inc., Dominion Voting Systems, Inc., or Dominion Voting Systems Corporation, which have any outstanding securities in the hands of the public:

- None

*/s/Laranda M. Walker*
Laranda M. Walker